IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRITTAN B. HOLLAND and LEXINGTON NATIONAL INSURANCE CORPORATION,<br><br>           Plaintiffs,<br><br>    v.<br><br>KELLY ROSEN, MARY E COLALILLO, and CHRISTOPHER PORRINO,<br><br>          Defendants. | HONORABLE JEROME B. SIMANDLE<br><br><br>Civil Action No.<br>17-4317 (JBS-KMW)<br><br><br>**OPINION** |

APPEARANCES:

Justin Taylor Quinn, Esq.
ROBINSON MILLER LLC
One Newark Center
19th Floor
Newark, NJ 07102
       -and-
Paul D. Clement, Esq. (pro hac vice)
Michael F. Williams, Esq.
Christopher G. Michel, Esq. (pro hac vice)
Andrew. C. Lawrence, Esq. (pro hac vice)
KIRKLAND & ELLIS LLP
655 Fifteenth Street NW
Washington, D.C. 20005
         Attorneys for Plaintiffs

Stuart Mark Feinblatt, Assistant Attorney General
Christopher Joseph Riggs, Deputy Attorney General
Office of the Attorney General
Hughes Justice Complex
25 W. Market Street
Trenton, NJ 08625
     Attorneys for Defendants

Alexander R. Shalom, Esq.
American Civil Liberties Union of New Jersey Foundation
89 Market Street, 7th Floor
P.O. Box 32159
Newark, NJ 07102
    -and-

Brandon J. Buskey, Esq. (<u>pro</u> <u>hac</u> <u>vice</u>)
Andrea Woods, Esq. (<u>pro</u> <u>hac</u> <u>vice</u>)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
      Attorneys for Amici Curiae American Civil Liberties Union,
      American Civil Liberties Union of New Jersey, Drug Policy
      Alliance, Latino Action Network, and National Association
      for the Advancement of Colored People - New Jersey State
      Conference

## Table of Contents

I.    INTRODUCTION............................................  3

II.   BACKGROUND..............................................  5

      A.   Historical Perspective on Bail in New Jersey........  5

      B.   The Criminal Justice Reform Act..................... 10

           1.   The Pretrial Release Decision.................. 11

           2.   The Risk Assessment Instrument................. 14

           3.   The Pretrial Detention Hearing................. 20

      C.   Effect of the CJRA on New Jersey's Criminal Justice
           System............................................. 23

      D.   Plaintiff Holland.................................. 24

      E.   Plaintiff Lexington................................ 28

      F.   The State Defendants............................... 29

      G.   Procedural History................................. 29

III.  STANDARD OF REVIEW...................................... 30

IV.   DISCUSSION.............................................. 34

      A.   Preliminary Issues................................. 34

           1.   Standing....................................... 34

           2.   *Younger* Abstention........................... 51

           3.   Habeas vs. 1983................................ 63

           4.   Summary of Preliminary Issues.................. 66

      B.   Likelihood of Success on the Merits................ 66

           1.   Eighth Amendment............................... 67

           2.   Fourteenth Amendment........................... 77

           3.   Fourth Amendment............................... 84

4.    Summary of Likelihood of Success Prong......... 84

C.    Probability of Irreparable Harm..................... 88

D.    Balance of Harms..................................... 90

E.    Considerations of the Public Interest............... 92

F.    Summary of Preliminary Injunction Factors.......... 93

**SIMANDLE, District Judge:**

## I.    INTRODUCTION

This dispute centers on the constitutionality of New Jersey's recently-enacted Criminal Justice Reform Act ("CJRA"). The matter is presently before the Court upon the motion of Plaintiffs Brittan B. Holland ("Holland") and Lexington National Insurance Corporation ("Lexington") for a preliminary injunction enjoining Defendants Kelly Rosen, the Team Leader for Pretrial Services in the Criminal Division of the Superior Court of New Jersey; Mary E. Colalillo, the Camden County Prosecutor; and Christopher S. Porrino, the Attorney General of New Jersey, (collectively, "the State Defendants" or "Defendants"), as well as their agents, "from taking any actions to enforce statutory provisions [of the CJRA] . . . that allow imposition of severe restrictions on the pre-trial liberty of presumptively innocent criminal defendants without offering the option of monetary bail." (Pl. Proposed Order.)

Holland is presently on pretrial release from the Superior Court of New Jersey on conditions including home confinement (except for employment) and electronic monitoring, but not cash

bail, as he faces charges for second-degree aggravated assault. Lexington is a bail bond provider that alleges its business in New Jersey has essentially dried up since the CJRA took effect on January 1, 2017, although it does not allege it has a bonding relationship with Holland or any other person processed under the CJRA.

The primary issue before the Court is whether Plaintiffs have a "reasonable probability of eventual success" on their claims that the CJRA violates Holland's Fourth, Eighth, and/or Fourteenth Amendment rights under the U.S. Constitution. This inquiry necessarily requires the Court to also consider jurisdictional issues, such as whether Plaintiffs have standing to bring their constitutional claims and whether the Court must abstain under Younger v. Harris, 401 U.S. 37 (1971), in light of Holland's ongoing state prosecution.

The Court heard oral argument at a Preliminary Injunction Hearing held on August 22, 2017 [Docket Item 42], and no testimony was offered beyond various affidavits and attached documents. After careful consideration, Plaintiffs' Motion for a Preliminary Injunction will be denied for the reasons explained below. The following constitute the Court's findings of fact and conclusions of law upon Plaintiffs' Motion for a Preliminary Injunction, pursuant to Federal Rule of Civil Procedure 52(a).

## II.  BACKGROUND

### A.  Historical Perspective on Bail in New Jersey

As under the Eighth Amendment of the U.S. Constitution, the New Jersey State Constitution ("State Constitution") provides: "[e]xcessive bail shall not be required." N.J. Const. art. 1, ¶ 12. For more than a century, the State Constitution additionally required: "[a]ll persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or presumption great." N.J. Const. of 1844, art. I, ¶ 10; see also N.J. Const. of 1947, art. I, ¶ 11 (2016) (retaining same language from 1844 Constitution).[1] Thus, New Jersey has long considered the right of an individual to bail before trial to be "a fundamental one." State v. Johnson, 61 N.J. 351, 355 (1972).

The constitutional guarantee that a criminal defendant be "bailable by sufficient sureties" produced tension in New Jersey's criminal justice system. On one hand, "any defendants — even those who posed a substantial risk of flight or danger to the community — could be released if they had access to untainted funds to post as bail." State v. Robinson, 229 N.J.

_____

[1] In 2007, New Jersey abolished the death penalty, P.L. 2007, c. 204 (Dec. 17, 2007), thereby guaranteeing that, under the State Constitution, all criminal defendants would be "bailable by sufficient sureties," N.J. Const. of 1947, art. I, ¶ 11. This provision of the State Constitution was amended effective January 1, 2017, as discussed below.

44, 52-53 (2017). On the other hand, "poorer defendants accused of less serious crimes, who presented minimal risk, were held in custody if they could not post even modest amounts of bail." Id. at 53.

For example, a 2013 Report revealed that on a particular day in 2012, a total of 13,003 inmates were housed in 20 of New Jersey's 22 county jails. Marie VanNostrand, Ph.D., Luminosity & the Drug Policy Alliance, New Jersey Jail Population Analysis 8 (Mar. 2013), https://university.pretrial.org/viewdocument/new-jersey-jail-popu)[hereinafter, "VanNostrand Report"]. About 9,500 inmates (or 73% of the sampled jail population) were confined because they were awaiting trial or sentencing in either Superior or Municipal Court. Id. at 11.[2] Most importantly, more than 5,000 inmates (or 38.5% of the sampled jail population) were in custody simply because they could not afford bail. Id. at 13.[3] A total of 1,547 of those inmates (or 12% of

---

[2] The average length of stay in jail for a criminal defendant awaiting trial was 314 days. VanNostrand Report at 12.
[3] Prior to enactment of the CJRA, criminal defendants in New Jersey had the option of posting bail with cash or by the 10% Deposit Option and the Cash/Bond Option. VanNostrand Report at 13. The latter Options enabled criminal defendants to pay a bail bondsman or company a fee in exchange for the bondsman posting bail for the defendant. See Dobrek v. Phelan, 419 F.3d 259, 261 (3d Cir. 2005)(citing Cap. Bonding Corp. v. N.J. Supreme Court, 127 F. Supp. 2d 582, 584 (D.N.J. 2001)). Once the bondsman posted bail, it then became his responsibility to get the defendant to court. If the defendant failed to appear, then the bail posted was forfeited, and the bondsman either became responsible for the amount of bail or for ensuring that the

the sampled jail population) were in pretrial custody because they could not afford $2,500 or less, including about 800 inmates who could have secured their release for $500 or less. Id. "In other words, one in eight inmates, who posed little risk, sat in jail pretrial because they were poor, while defendants charged with serious crimes who posed a substantial risk of danger or flight could be released into the community without monitoring so long as they could make bail." Robinson, 229 N.J. at 53.

In 2012, Governor Chris Christie called for a constitutional amendment to reform New Jersey's pretrial detention system. Id. Chief Justice Stuart Rabner of the New Jersey Supreme Court subsequently established a Joint Committee on Criminal Justice ("the Joint Committee") to examine "issues relating to bail and the delays in bringing criminal cases to trial." Joint Committee, Report of the Joint Committee on Criminal Justice at 1 (Mar. 10, 2014), available at https://www.judiciary.state.nj.us/courts/assets/criminal/finalre port3202014.pdf. The Joint Committee was comprised of members from all three branches of state government and included judges, prosecutors, public defenders, private counsel, court

fugitive defendant was captured and brought to court. If, on the other hand, the defendant appeared in court on his own accord, the posted bail would be returned to the bondsman, who would also keep the original fee paid by the defendant.

administrators, and staff from the Legislature and Governor's

office. Id.

On March 10, 2014, the Report of the Joint Committee on

Criminal Justice was issued. Id. According to the Joint

Committee:

> the current system presents problems at both ends of the
> spectrum: defendants charged with less serious offenses,
> who pose little risk of flight or danger to the community,
> too often remain in jail before trial because they cannot
> post relatively modest amounts of bail, while other
> defendants who face more serious charges and have access to
> funds are released even if they pose a danger to the
> community or a substantial risk of flight.

Id. at 2. To that end, the Joint Committee first recommended

that "New Jersey should move from a largely 'resource-based'

system of pretrial release to a 'risk-based' system of pretrial

release." Id. at 8. Among several other proposals, the Joint

Committee further recommended that "[a] statute should be

enacted requiring that an objective risk assessment be performed

for defendants housed in jail pretrial, using an assessment

instrument that determines the level of risk of a defendant,"

and "[n]onmonetary conditions of release that correspond to the

level of risk should be established." Id.

After conducting hearings on the Joint Committee's findings

and recommendations, the State Legislature proposed and passed

the Criminal Justice Reform Act, S. 946, A. 1910 (2014). On

August 11, 2014, Governor Christie signed the CJRA into law. L. 2014, c. 31 (codified at N.J.S.A. 2A:162-15 to -26).

Enforcement of the CJRA was predicated on ratification of a proposed amendment to the State Constitution that would authorize New Jersey courts to deny the pretrial release of certain defendants. See N.J.S.A. 2A:162-15 Note. In a state-wide referendum held on November 4, 2014, New Jersey voters approved such an amendment by a vote of 68% to 32%. Div. of Elections, Dep't of State, Official List: Public Question Results for 11/04/2014 General Election Public Question No. 1 (Dec. 2, 2014), http://nj.gov/state/elections/2014-results/2014-official-general-public-question-1.pdf.

The amendment, which took effect on January 1, 2017, replaced Article 1, Paragraph 11 of the State Constitution (which had previously guaranteed all criminal defendants the right to be "bailable by sufficient sureties") with the following:

> All persons shall, before conviction, be eligible for pretrial release. Pretrial release may be denied to a person if the court finds that no amount of monetary bail, non-monetary conditions of pretrial release, or combination of monetary bail and non-monetary conditions would reasonably assure the person's appearance in court when required, or protect the safety of any other person or the community, or prevent the person from obstructing or attempting to obstruct the criminal justice process. It shall be lawful for the Legislature to establish by law procedures, terms, and conditions applicable to pretrial release and the denial thereof authorized under this provision.

N.J. Const. art. 1, ¶ 11. Notably, the amendment did <u>not</u> affect the "excessive bail" clause of the State Constitution, <u>N.J. Const.</u> art. 1, ¶ 12.

**B.   The Criminal Justice Reform Act**

Through enactment of the CJRA, New Jersey sought to promote three separate goals in considering conditions of pretrial release: (1) reasonably assuring the person's appearance in court; (2) protecting the community and persons; and (3) preventing the obstruction of justice by persons awaiting trial. <u>See</u> N.J.S.A. 2A:162-15. To that end, the CJRA modified New Jersey's previous criminal justice system in several ways. First, the CJRA permits judges to order the pretrial detention of certain defendants if the court "finds clear and convincing evidence that no condition or combination of conditions can reasonably assure the effectuation of [the CJRA's] goals." <u>Id.</u>; <u>see also</u> N.J.S.A. 2A:162-18(a)(1). Second, the CJRA shifts New Jersey's bail system away from one that is resource-based (<u>i.e.</u>, posting money bail) and towards one that relies upon an objective evaluation of an individual defendant's level of risk. N.J.S.A. 2A:162-17, -25(d); <u>see also</u> <u>Report of the Joint Committee on Criminal Justice</u> at 8 (recommending that "New Jersey should move away from a largely 'resource-based' system of pretrial release to a 'risk-based' system of pretrial

release"). Finally, the CJRA establishes speedy trial deadlines for defendants who are detained pending trial, N.J.S.A. 2A:162-22, which is not at issue in this case.

### 1. The Pretrial Release Decision

Once a complaint-warrant is issued based on a judicial officer's finding of probable cause, an "eligible defendant"[4] "shall be temporarily detained to allow the Pretrial Services Program to prepare a risk assessment with recommendations on conditions of release." N.J.S.A. 2A:162-16(a). Within 48 hours of a defendant's commitment to jail, the court must make a "pretrial release decision." N.J.S.A. 2A:162-16(b)(1).

In making a pretrial release decision, the court must impose "the least restrictive condition, or combination of conditions, that the court determines will reasonably assure the eligible defendant's appearance in court when required, the protection of the safety of any other person or the community, and that the eligible defendant will not obstruct or attempt to obstruct the criminal justice process." N.J.S.A. 2A:162-17(d)(2). Thus, the purposes of pretrial release are enlarged to address concerns not only of appearance in court but also

---

[4] Under the CJRA, "eligible defendant" is defined as "a person for whom a complaint-warrant is issued for an initial charge involving an indictable offense or a disorderly persons offense unless otherwise provided in sections 1 through 11 of P.L. 2014, c. 31." N.J.S.A. 2A:162-15.

protection of the safety of other persons and the community and deterring obstruction of the criminal justice process — concerns not normally addressed through monetary bail.

To assist in the pretrial release decision-making process, the CJRA provides a five-stage, hierarchical process for courts to follow. <u>Robinson</u>, 229 N.J. at 55-57. **First**, the court must order that a defendant be released on his own personal recognizance or an unsecured bond if such release is adequate to ensure the defendant's appearance in court and safety of the public. N.J.S.A. 2A:162-16(b)(2)(a), -17(a). **Second**, if release on personal recognizance is inadequate, the court may release the defendant on "a <u>non-monetary</u> condition or conditions,[5] with the condition or conditions being the least restrictive condition or combination of conditions" that are adequate to ensure the defendant's appearance in court and the safety of the public. N.J.S.A. 2A:162-16(b)(2)(b), -17(d)(2) (emphasis added.) **Third**, if non-monetary conditions are inadequate, the court may release the defendant subject to monetary bail, but <u>only</u> to

---

[5] Non-monetary conditions of release may, for example, require that the defendant "remain in the custody of a designated person;" "maintain employment, or, if unemployed, seek employment;" "report on a regular basis to a designated law enforcement agency . . . or pretrial services program;" "comply with a specified curfew;" "refrain from owning a firearm;" or "be placed in a pretrial home supervision capacity with or without the use of an approved electronic monitoring device." N.J.S.A. 2A:162-17(b)(2).

reasonably assure the defendant's appearance in court. N.J.S.A. 2A:162-16(b)(2)(c), -17(c).[6] **Fourth**, if the above non-monetary conditions are insufficient, the court may release the defendant subject to a combination of monetary and non-monetary conditions reasonably calculated to assure the defendant's appearance in court and safety of the public. N.J.S.A. 2A:62-16(b)(2)(c), -17(d). **Fifth**, if the prosecutor has moved for pretrial detention and a judge determines no combination of monetary and non-monetary conditions are adequate to ensure the defendant's appearance in court or safety of the public, the court may order that the defendant remain detained pending a pretrial detention hearing. N.J.S.A. 2A:162-16(b)(2)(d), -18(a)(1).

Before making any pretrial release decision for an eligible defendant, a judge is required to consider, but is not bound by, the Pretrial Services Program's risk assessment and recommendations on conditions of release (described below). N.J.S.A. 2A:162-16. "If the court enters an order that is contrary to a recommendation made in a risk assessment when determining a method of release or setting release conditions, the court <u>shall</u> provide an explanation in the document that

---

[6] As explained below, Plaintiffs assert that monetary conditions should be considered up front, rather than as a last option, because the U.S. Constitution provides a right to consideration of monetary bail.

authorizes the eligible defendant's release." N.J.S.A. 2A:162–23(emphasis added).

### 2. <u>The Risk Assessment Instrument</u>

Under the CJRA, the Pretrial Services Program's risk assessment must be conducted using a "risk assessment instrument" that is approved by the Administrative Director of the New Jersey Courts. N.J.S.A. 2A:162-25(c). This instrument must be "objective, standardized, and developed based on analysis of empirical data and risk factors relevant to the risk of failure to appear in court when required and the danger to the community while on pretrial release." N.J.S.A. 2A:162-25(c)(1).

In partnership with the Laura and John Arnold Foundation, the New Jersey courts adopted an automated risk assessment instrument that contains a risk <u>measurement</u> component, called the Public Safety Assessment ("PSA"), as well as a risk <u>management</u> component, called the Decision Making Framework ("DMF"). Glenn A. Grant, J.A.D., New Jersey Courts, <u>2016 Report to the Governor and Legislature</u> at 4 (Dec. 31, 2016), available at https://www.judiciary.state.nj.us/courts/assets/criminal/2016cjrannual.pdf.

#### a. *The Public Safety Assessment*

Under the risk assessment instrument adopted by the New Jersey courts, the state police must first gather criminal

14

history information from various law enforcement and court databases, including the NJ State Police criminal case history system, the PROMIS/GAVEL criminal database, the MACS municipal court database, and other sources. State v. C.W., 449 N.J. Super. 231, 238-39 (Mar. 21, 2017) (citing N.J. Attorney General Law Enforcement Directive No. 2016-6 at 15-16 (October 11, 2016), available at http://www.nj.gov/oag/dcj/agguide/directives/2016-6_Law-Enforcement.pdf). The PSA then uses the information derived from these sources to address nine risk factors: (1) the defendant's age at the time of arrest; (2) whether the offense charged is "violent"; (3) other charges pending against the defendant at the time of the alleged offense; (4) prior disorderly persons convictions; (5) prior indictable convictions; (6) prior "violent" convictions; (7) prior failures to appear at a pre-deposition court date within the two years preceding the alleged offense; (8) prior failures to appear at a pre-disposition court date more than two years preceding the alleged offense; and (9) prior sentences to incarceration of 14 days or more. C.W., 449 N.J. Super at 239; see also ACLU of New Jersey, NACDL, and NJ Office of the Public Defender, The New Jersey Pretrial Justice Manual at 8 (Dec. 2016), available at https://www.nacdl.org/NJPretrial/. These objective risk factors are race and gender neutral, and do not

require the police to interview the defendant. <u>2016 Report to the Governor and Legislature</u> at 4.

Using an algorithm, the automated process generates the PSA, which "scores" three different categories: (1) Failure to Appear ("FTA"); (2) New Criminal Activity ("NCA"); and (3) New Violent Criminal Activity ("NVCA").

i.      Failure to Appear Score

A defendant's FTA score, which is used to calculate the risk that a defendant will fail to appear at future court proceedings, is calculated using the following framework: (1) if the defendant has a pending charge against him he receives one point; (2) one point is added if the defendant has a prior conviction; (3) another point is added if the defendant failed to appear at a pre-disposition court date more than two years ago; and (4) if the defendant failed to appear at a pre-disposition court date within two years of the alleged offense, two point are added (and if the defendant failed to appear at more than one pre-disposition court dates within the past two years, four points are added). <u>The New Jersey Pretrial Justice Manual</u> at 8. The defendant's raw score is then converted into a six-point scale, with one being the lowest score a defendant can receive and six being the highest. <u>Id.</u>

A defendant's NCA score, which is used to predict the risk that the defendant will commit new criminal activity while on release, is calculated using the following framework: (1) if the defendant is 22 years old or younger he receives two points; (2) three points are added if there were pending charges against the defendant at the time of the arrest; (3) one point is added if the defendant has a prior disorderly persons offense; (4) another point is added if the defendant has a prior conviction for an indictable offense; (5) one more point is added if the defendant has been convicted of a "violent" crime on one or two occasions (if there are three or more convictions for crimes of violence, two points are added); (6) if the defendant failed to appear at a pre-disposition court date within two years of the alleged offense, one point is added (and if the defendant failed to appear at more than one pre-disposition court dates within the past two years, two points are added); and (7) if the defendant has previously been sentenced to a term of incarceration, two more points are added. Id. Again, the defendant's raw score is converted into a six-point scale, with one being the lowest score a defendant can receive and six being the highest. Id.

### iii.    New Violent Criminal Activity Flag

Finally, a score is generated to determine if a criminal defendant should be flagged for NVCA, which indicates that there is a greater statistical likelihood the defendant will engage in new violent criminal activity if released. A defendant receives a NVCA flag if he scores four or more points under the following framework: 1) a defendant receives two points if the current offense is considered "violent"; 2) one point is added if the offense is "violent" and the defendant is under 21; 3) an additional point is added when the defendant has pending charges against him at the time of the alleged offense; 4) one point is added if the defendant has a prior conviction; and 5) one more point is added if the defendant has one or two prior "violent" convictions (if the defendant has three or more he receives two points). Id. at 9. Under the CJRA, a NVCA flag "make[s] release less likely," and criminal defendants "who are released after receiving a flag will be released under more onerous conditions." Id.

### b.    *The Decision Making Framework*

After the PSA scores are calculated, the Pretrial Services Agency provides a recommendation to the judge in a "Decision Making Framework" about whether a defendant should be released pending trial and, if so, under what conditions. Id. at 10.

The Decision Making Framework recommends a Pretrial Monitoring Level ("PML") for each criminal defendant, which ranges from release on one's own recognizance ("ROR") to pretrial detention. Id. A defendant released ROR will have no conditions or restrictions placed on them. Id. At PML 1, a defendant is required to report to a pretrial services officer by phone once per month. Id. At PML 2, a defendant must report to a pretrial services officer once a month in person, once a month by telephone, and be subject to monitored conditions such as a curfew. Id. At PML 3, a defendant is monitored in-person or by phone every week, and he is subject to additional monitored conditions. Id. At PML 3 Plus Electronic Monitoring or Home Detention ("PML 3+"), a defendant is subject to all the same conditions previously described, but may also be confined to their home and/or required to wear a GPS monitoring device on their ankle at all times. Id. Finally, as an option of last resort, a defendant will be detained in jail pending trial. Id.

The DMF is a four-step process. **First**, as described in See Section II.B.2.a, supra, the defendant's PSA is completed to produce FTA and NCA scores and a flag for NVCA. Id. **Second**, the court determines whether the pending charges are serious enough on their own to warrant a recommendation of "release not recommended; if released maximum conditions," irrespective of the PSA. Id. Such charges include murder, aggravated

manslaughter, aggravated sexual assault, and carjacking. Id.
Pretrial detention (or PML 3+, if released) is also recommended
when the defendant receives an NVCA flag in the PSA and the
charged offense is "violent." Id. **Third**, the court applies the
FTA and NCA scores to a DMF matrix. Id. at 11 (chart describing
DMF matrix.) **Fourth**, the court determines whether the defendant
has been charged with a No Early Release Act crime. Id. (citing
N.J.S.A. 2C:43-7.2, 30:4-123.51(b)). If so, the recommended PML
is increased by one level (e.g., from ROR to PML 1 or from PML 1
to PML 2). The New Jersey Pretrial Justice Manual at 11.

### 3. The Pretrial Detention Hearing

If a prosecutor applies for pretrial detention,[7] the court
must hold a pretrial detention hearing no later than the
defendant's first appearance or within three days of the
prosecutor's motion. N.J.S.A. 2A:162-19(d)(1). The court may,
however, grant a continuance of up to three days upon request by
the prosecutor or up to five days upon request by the defendant.
Id.

At the pretrial detention hearing, the defendant has a
right to be represented by counsel and, if indigent, have
counsel appointed. N.J.S.A. 2A:162-19(e)(1). The defendant also

---

[7] The CJRA enumerates the offenses for which a prosecutor may
seek pretrial detention. See N.J.S.A. 2A:162-19(a) (including,
for present purposes, aggravated assault).

has the right to testify, present witnesses, cross-examine any of the prosecutor's witnesses, and present information by proffer. Id. The prosecutor, meanwhile, carries the burden to establish probable cause that the eligible defendant committed the predicate offense. N.J.S.A. 2A:162-19(e)(2).

Ultimately, the court may order the defendant detained only if the judge finds by "clear and convincing evidence that no amount of monetary bail, non-monetary conditions of pretrial release[,] or combination of monetary bail and conditions" are adequate to ensure the defendant's appearance in court, the safety of the public, and that the eligible defendant will not obstruct or attempt to obstruct justice. N.J.S.A. 2A:162-18(a)(1), -19(e)(3).

In making a pretrial detention hearing determination, the court may take into account information including: (a) the nature and circumstances of the offense charged; (b) the weight of the evidence against the eligible defendant; (c) the history and characteristics of the eligible defendant; (d) the nature and seriousness of the danger that would be posed by the eligible defendant's release; (e) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the eligible defendant's release; and (f) the PSA and DMF prepared by the Pretrial Services Program (described above). N.J.S.A. 2A:162-20. Thus, at

the detention hearing, the PSA and DMF scores are not binding or even presumptive of the judge's determination of detention or release, but are factors that must be considered, along with others, to adjudicate whether the prosecution has met its burden of detention.

If the court orders a defendant detained pending trial, the judge must "include written findings of fact and a written statement of . . . reasons" in an order. N.J.S.A. 2A:162-21(a). If the court authorizes a defendant's release contrary to the Pretrial Services Program's recommendation, "the court shall provide an explanation" in the order of release. N.J.S.A. 2A:162-23(a)(2).

A defendant has the right to appeal a judge's pretrial detention hearing decision. N.J.S.A. 2A:162-18(c). Any such appeal "shall be heard in an expedited manner." Id.

Additionally, under the New Jersey Court Rules, "a Superior Court may review the conditions of pretrial release . . . on its own motion, or upon motion by the prosecutor or the defendant alleging that there has been a material change in circumstance that justifies a change in conditions." N.J.S.A. 3:26-2(c)(2). Under this Rule, any review of conditions "shall be decided within 30 days of the filing of the motion." Id.

## C.  Effect of the CJRA on New Jersey's Criminal Justice System

The Criminal Justice Reform Act took effect on January 1, 2017. N.J.S.A. 2A:162-15. This reform has shown great success in placing persons into pretrial release who would previously have been held in jail for failure to meet monetary bail and because pretrial monitoring options were largely unavailable. As a result, many fewer defendants are being detained in jail as they await trial, as shown by the following statistics.

According to statistics published by the New Jersey Courts, on June 30, 2017, there were 5,717 inmates pending trial. New Jersey Courts, CJRA Statistics, Chart C, available at https://www.judiciary.state.nj.us/courts/assets/criminal/cjrearl yreport1.pdf. By comparison, on the same day in 2015, there were 8,845 inmates waiting for trial. Id. This drop in the pretrial jail population represents a 35.4% decrease over a two-year period. Id.; see also Smith Decl. at ¶ 12.

Between January 1 and June 30, 2017, 9.9% of eligible defendants were released on their own recognizance, 21.5% were released under PML 1, 14.7% were released under PML 2, 25.8% were released under PML 3, 10.8% were released under PML 3+, and only 14.2% were detained. CJRA Statistics, Chart A.

Furthermore, detention motions have not been automatically granted. Over the same six-month period, for example, 60% of

prosecutors' detention motions were granted, while 40% were denied. CJRA Statistics, Chart B.

### D.  **Plaintiff Holland**

On April 6, 2017, Holland was arrested and charged with second-degree aggravated assault, N.J.S.A. 2C:12-1(B)(1). (Exs. A, B, & C to Feldman Decl.) According to police records, Holland engaged in an altercation with an unnamed individual in the parking lot of Joe's Tavern in Sicklerville, New Jersey. (Holland Decl. at ¶ 7; Ex. C to Feldman Decl.) First, Holland allegedly struck the unnamed individual in the face, causing him to fall to the ground. (Id.) Then, once the unnamed individual was on the ground, Holland allegedly "continued to strike [him] repeatedly about the head and face causing serious bodily harn [sic][,]" including multiple face fractures. (Id.) According to police records, Holland fled the scene and was later arrested at his home, where "[h]is clothing was covered in fresh blood." (Id.)

The Pretrial Services Program in Camden County collected information for Holland's Public Safety Assessment for determination of detention or release by the judge.[8] As the parties acknowledged at oral argument, Holland ultimately

---

[8] Of note, prior to the alleged incident that led to Holland's arrest, he had been convicted of simple assault, (Feldman Decl. ¶ 8), which New Jersey law treats as a disorderly persons offense, N.J.S.A. 2C:12-1(a).

received a PSA score of 2 (out of 6) for Failure to Appear, a score of 2 (out of 6) for New Criminal Activity, and was flagged for NVCA. [Docket Item 42; see also Docket Item 43.][9] Due to the NVCA flag, the DMF generated by the Pretrial Services Program recommended that Holland be detained pending trial. (Feldman Decl. ¶ 7.)

Consistent with the CJRA and Attorney General Directive 2016-6, Section 7.4.1, Camden County Assistant Prosecutor Leo Feldman prepared a motion for Holland's pretrial detention. (Feldman Decl. at ¶ 8.) On April 7, 2017, Assistant Prosecutor Geraldine Zidow submitted a Notice to the Camden County Superior Court, explaining that the State planned to move for Holland's pretrial detention. (Ex. E of Feldman Decl.) Assistant Prosecutor Zidow also filed a Certification, affirming that Holland "is charged with a crime and there is a serious risk that: the defendant will not appear in court as required [and] the defendant will pose a danger to any other person or the community." (Id.)

---

[9] It is not clear from the record how Holland received such low PSA scores, but still received a flag for NVCA. Assuming Holland was given the minimum four points required under the NVCA framework to receive a flag, the Court deduces that the PSA calculated Holland's NVCA score as follows: two points under Factor 1 for Holland's pending second-degree assault charges; one point under Factor 4 for Holland's prior simple assault conviction; and one point under Factor 5, again, for Holland's prior simple assault conviction.

Prior to Holland's pretrial detention hearing, Assistant Prosecutor Feldman met with Holland's court-appointed attorney, Brad Wertheimer, Esq. (Feldman Decl. ¶ 9.) At this meeting, Mr. Wertheimer agreed to recommend to his client that, in exchange for Prosecutor Feldman withdrawing the prosecution's motion for pretrial detention, Holland would agree to be released under PML Level 3+, which would include house arrest (except for employment), electronic monitoring by GPS monitoring device, weekly reporting, and no contact with the victim. (Id. at ¶ 10.)

On April 11, 2017, a pretrial detention hearing was held before the Honorable Kathleen Delaney, J.S.C. (Id. at ¶ 14; Ex. G to Feldman Decl.) During the hearing, Holland agreed to a level PML 3+ in exchange for the State withdrawing its application for detention. (Id. at 4:17-25; 5:1-8.) After finding that Holland was indigent,[10] the court waived the cost of

_____

[10] The record is incomplete regarding Holland's financial status and his ability to meet a reasonable monetary bail if one were set in lieu of the non-monetary conditions he complains of. In the Superior Court, he has been determined to be indigent and is represented by the Public Defender (Feldman Decl. ¶ 19), and the judge waived Holland's fee for the electronic monitoring device due to indigency (Tr. Apr. 11, 2017 at 5:18-19). On the other hand, Holland has full-time employment as a lead journeyperson (Tr. Apr. 11, 2017 at 4:1-5), and his counsel asserts that "with the help of a bail bondsman, he could have posted bail to secure his release at trial" (Pl. Rep. Br. at 3), and that under the previous system of monetary bail, he "would have used his own financial resources or those of his family (likely with the help of a surety like Lexington) to pay the required amount for release." (Pl. Rep. Br. at 15, citing Holland Decl. ¶ 11.) The amount of his hypothetical monetary bail is unknown, as is his

the ankle bracelet. (Id. at 5:18-19.) The court also granted

Holland permission to go to work. (Id. at 4:1-6; 5:1-2.) Holland

was subsequently released, subject to the PML Level 3+ terms

outlined above. (Holland Decl. at ¶ 18.)

According to Holland, under home detention, he "cannot shop

for food or other necessities," nor can he take his son to

baseball practices, "which is an important aspect of [his]

custodial responsibilities and efforts to bond with [his]

child." (Id. at ¶¶ 21-22.) Under electronic monitoring, Holland

must wear a GPS tracking device around his ankle at all times,

including within cord-length of an electrical outlet, while the

ankle bracelet charges, for two hours each day. (Id. at ¶ 24.)

Holland also avers that the ankle bracelet is "a source of

public stigma and shame," and "is bulky, uncomfortable,

restrictive, and makes it more difficult to live [his] life and

do [his job]." (Id. at ¶¶ 25-26.) Finally, Holland explains that

the bi-monthly, in-person reporting requirement "requires [him]

---

ability — with or without a bondsman — to meet the required
amount. It is possible, and perhaps likely, that Holland,
accused of a serious crime of violence and presenting the flight
risk of one who allegedly fled from the scene of the crime,
would have been, before January 1, 2017, in the large category
of individuals who were detained because they could not meet the
high monetary bail requirements, notwithstanding the
availability of bail bonding. In other words, to the extent
Holland's case rests on the premise that he would be released on
monetary bail without significant non-monetary conditions, that
hypothetical is doubtful in his circumstances.

to leave [his] job and travel to the pretrial services office, even if the trip would interfere with [his] work." (Id. at ¶ 28.) Collectively, Holland states, these conditions have "severely restricted [his] liberty, disrupted [his] family life, made [him] concerned about [his] job security, and made [him] feel that [his] life is up in the air." (Id. at ¶ 29.)

Holland has never sought a judicial determination of his conditions of release, nor has he sought modification in the Superior Court of the conditions to which he agreed.

### E.    Plaintiff Lexington

Lexington National Insurance Corporation is a Florida Corporation based in Maryland. (Wachinski Decl. at ¶¶ 3-4.) Lexington operates across the country, primarily for the purpose of underwriting bail bonds and acting as a surety of bail bonds. (Id. at ¶ 6.) In New Jersey, Lexington operates through independent insurance producers (bail bondsmen), who are licensed by the state's Department of Banking and Insurance and registered with the Superior Court Clerk. (Id. at ¶ 8.)

Lexington alleges that, as a result of the CJRA, its business has been "severely harmed." (Id. at ¶ 9.) According to Lexington, the CJRA "dramatically reduc[ed] the number of defendants given monetary bail and thus dramatically reduc[ed] [Lexington's] opportunity to act as surety on bail bonds." (Id.) That the CJRA has all but eliminated the use of money bail and

bail bonds to secure pretrial release is indeed demonstrated by the data, as discussed above.

**F. The State Defendants**

Defendant Kelly Rosen is the Team Leader for Pretrial Services in the Criminal Division of the Superior Court of New Jersey. (Compl. at ¶ 18.) In this capacity, Defendant Rosen is responsible for enforcing the pretrial release conditions authorized by the CJRA and imposed on Holland. (Id.)

Defendant Mary Eva Colalillo is the Camden County Prosecutor. (Id. at ¶ 19.) As Camden County Prosecutor, Defendant Colalillo is responsible for enforcing New Jersey laws, including the CJRA, in Camden County. (Id.)

Defendant Christopher S. Porrino is the Attorney General of New Jersey. (Id. ¶ 20.) As Attorney General, Defendant Porrino is ultimately responsible for enforcing New Jersey's laws, including the CJRA, across the state. (Id.)

**G. Procedural History**

On June 14, 2017, Plaintiffs simultaneously filed a class action Complaint and a Motion for a Preliminary Injunction. [Docket Items 1, 3.] On July 28, 2017, the State Defendants filed an Opposition to Plaintiffs' Motion for a Preliminary Injunction. [Docket Items 23, 24.][11] On August 7, 2017,

---

[11] On July 28, 2017, the State Defendants also filed a Motion to Dismiss in lieu of an Answer. [Docket Item 24.] The briefing

Plaintiffs filed a Reply Brief to the State Defendants'
Opposition. [Docket Item 29.]

On July 21, 2017, the American Civil Liberties Union
("ACLU"), on behalf of themselves and the ACLU of New Jersey,
Drug Policy Alliance, Latino Action Network, and National
Association for the Advancement of Colored People – New Jersey
Conference, filed a motion for leave to appear as amicus curiae.
[Docket Item 18.] On August 8, 2017, the Court granted the
ACLU's request to submit a brief and participate as amicus
curiae in oral argument with regard to Plaintiffs' Motion for a
Preliminary Injunction. [Docket Item 31.]

On August 22, 2017, the Court convened the Preliminary
Injunction Hearing. [Docket Item 42.]

### III. STANDARD OF REVIEW

A preliminary injunction "is an extraordinary remedy . . .
which should be granted only in limited circumstances." Am. Tel.
& Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421,
1427 (3d Cir. 1994) (citation omitted). A preliminary injunction
"should not be granted unless the movant, by a clear showing,
carries the burden of persuasion." Mazurek v. Armstrong, 520

---

schedule was deferred pending a determination of this
preliminary injunction motion. [Text Order of Sept. 5, 2017 at
Docket Item 46.] The Court reserves judgment on the State
Defendants' motion until briefing has been completed by both
parties.

U.S. 968, 972 (1997) (per curiam) (internal quotations omitted;

emphasis in original). "[T]he requirement for substantial proof"

is much higher for "a plaintiff's motion for preliminary

injunctive relief" than it is for a "defendant's motion for

summary judgment[,]" where "one would demand <u>some</u> evidence . . .

in order to avoid a nonsuit." <u>Id.</u> (emphasis in original); <u>see</u>

<u>also</u> <u>Schuchardt v. President of the U.S.</u>, 839 F.3d 336, 351 (3d

Cir. 2016) (citing <u>Obama v. Klayman</u>, 800 F.3d 559, 568 (D.C.

Cir. 2015) for proposition that "summary judgment imposes a

lighter burden than the 'substantial likelihood of success'

necessary to obtain a preliminary injunction").

To prevail on a motion for preliminary injunctive relief,

the moving party must show as a prerequisite:

> (1) a reasonable probability of eventual success in the
> litigation, and (2) that it will be irreparably injured . .
> . if relief is not granted. . . . [In addition,] the
> district court, in considering whether to grant a
> preliminary injunction, should take into account, when they
> are relevant, (3) the possibility of harm to other
> interested persons from the grant or denial of the
> injunction, and (4) the public interest.

<u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 176 (3d Cir. 2017)

(quoting <u>Del. River Port Auth. v. Transamerican Trailer</u>

<u>Transport, Inc.</u>, 501 F.2d 917, 919-20 (3d Cir. 1974) (further

internal citations omitted)). "[A] district court — in its sound

discretion — should balance th[e]se four factors so long as the

party seeking the injunction meets the threshold on the first two." Reilly, 858 F.3d at 176.

In order to meet the threshold to establish the first factor, the moving party "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." Id. at 179. However, "more than a mere possibility of relief is required" to make the required showing; the moving party must show "a reasonable probability of eventual success." Id. at 179 n.3 (internal quotations omitted).

To satisfy the second factor, the moving party "must demonstrate . . . the probability of irreparable harm if relief is not granted." Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988) (internal quotations omitted). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989). The moving party must demonstrate that it is likely to suffer "actual or imminent harm which cannot otherwise be compensated by money damages," or it "fail[s] to sustain its substantial burden of showing irreparable harm." Frank's GMC, 847 F.2d at 103; see

32

also <u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction.") (emphasis in original). In short, "a movant for preliminary equitable relief must . . . demonstrate . . . that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." <u>Reilly</u>, 858 F.3d at 179 (footnote omitted).

The third factor requires the court to "balance the parties' relative harms; that is, the potential injury to the plaintiffs without this injunction versus the potential injury to the defendant with it in place." <u>Issa v. School Dist. of Lancaster</u>, 847 F.3d 121, 143 (3d Cir. 2017). The court should also, at this stage, take into account "the possibility of harm to other interested persons from the grant or denial of the injunction." <u>Reilly</u>, 858 F.3d at 176 (quoting <u>Del. River Port Auth.</u>, 501 F.2d at 920 (further citations omitted)). "[W]hen considerable injury will result from either the grant or denial of a preliminary injunction, these factors to some extent cancel each other[.]" <u>Del. River Port Auth.</u>, 501 F.2d at 924.

Finally, the Supreme Court has noted that "parts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

Instant Air Freight, 882 F.2d at 803 (quoting Virgininan Ry. Co. v. System Fed'n No. 40, 300 U.S. 515, 552 (1937)). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). While weighing whether the public interest favors a preliminary injunction "is often fairly routine," Issa, 847 F.3d at 143 (internal quotations omitted), "'where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'" Romero-Barcelo, 456 U.S. at 312-13 (quoting Yakus v. United States, 321 U.S. 414, 440 (1944)).

## IV. DISCUSSION

### A. Preliminary Issues

#### 1. Standing

Defendants argue that a preliminary injunction should be denied because both Holland and Lexington lack standing under Article III. (Def. Opp. Br. at 2-23; Amici Br. at 10-19.) If standing is doubtful at this stage, and pending a final determination, this factor should weigh strongly against granting a preliminary injunction. Plaintiffs contest this,

stating that Holland has first-party standing and Lexington has both standing in its own right and third-party standing to assert the constitutional rights of potential customers. (Pl. Rep. Br. at 2-5.)

In order to demonstrate that it has standing under Article III, a plaintiff must demonstrate: "(1) an injury-in-fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." Finkelman v. Nat'l Football League, 810 F.3d 187, 193 (3d Cir. 2016) (internal quotations omitted). These elements of constitutional standing may be referred to as injury (or injury-in-fact), traceability, and redressability, respectively. See Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 137-42 (3d Cir. 2009).

The Court will address the standing of each plaintiff in turn.

a.  *Plaintiff Holland*

The State Defendants argue that Holland "lacks standing because he has failed to demonstrate that his alleged injury will be redressed by a favorable judicial decision. . . . [E]ven if the Court ruled in Holland's favor on his request for imposition of monetary bail to address flight, the challenged non-monetary conditions likely would still be imposed . . . .

His alleged injury therefore would not be redressed." (Def. Opp. Br. at 21.)[12]

In response, Plaintiffs claim that the State Defendants' position that the same challenged conditions "likely would still be imposed" is "pure speculation and legally irrelevant." (Pl. Rep. Br. at 3.) Plaintiff claims that he has a constitutional right to "a process where [monetary] bail was considered on an equal footing with other options to secure his release. . . . [H]is injury would be redressed without regard to the outcome of a constitutionally-compliant process. That is enough to satisfy redressability. . . . [T]his Court certainly does not need to conduct the very bail proceeding Holland was denied to resolve the threshold question of standing." (Id.)

The Court is mindful of the requirement under Article III that as to redressability, the plaintiff must show that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (internal quotations omitted).

---

[12] Defendants do not contest that Holland has adequately alleged an injury in fact and a sufficient causal connection between that injury and the conduct he alleges to have violated his constitutional rights, thereby satisfying the elements of injury-in-fact and traceability.

It is true that the ultimate outcome of any subsequent hearing that is or may be held in the state court with regard to Holland's conditions of pretrial release is, as yet, unknown. Any court holding such a hearing might continue the complained-of restrictions on his liberty, regardless of giving consideration to monetary bail. In other words, despite imposing monetary bail as a restriction addressing risk of flight, there could continue to be such non-monetary conditions as restrictions on associations, curfew, in-person reporting and the like that would still need to be considered to address the risk his release may pose to the community or to other persons.

However, Holland claims that his injury is not simply the restriction on his liberty, but rather the imposition of that restriction after a hearing that violated his rights under the Fourth, Eighth, and Fourteenth Amendments. He claims that such injury will be sufficiently redressed should the Court order that a hearing respecting those constitutional rights (as he understands them) be held, regardless of the ultimate outcome of such a hearing. Should the Court order such a hearing to be held, the relief then would not be speculative. He claims that he was injured by the holding of a hearing that did not afford him his constitutional rights, including the alleged right to have monetary bail considered as a primary condition of release pending trial, and that ordering a new hearing that does afford

him those rights will redress that injury. The Court finds that analysis persuasive to establish Holland's standing to assert his claims. The redress he seeks is a hearing to set conditions of release where monetary bail is given a primary consideration. Whether he is likely to accomplish his objectives at a Superior Court hearing is a question for the merits, not one of standing to assert the right to such a hearing. Accordingly, the Court finds that Holland has adequately pled the necessary elements of Article III standing, including redressability.

b.   *Plaintiff Lexington*

Lexington's standing presents a more complex and closer question.[13] The parties first contest whether Lexington may assert first-party standing. (Def. Opp. Br. at 21-22; Pl. Rep. Br. at 3-4; Amici Br. at 11-12.) The parties then address whether Lexington may proceed with third-party standing under Dep't of Labor v. Triplett, 494 U.S. 715 (1990) (Def. Opp. Br. at 22-23; Pl. Rep. Br. at 4-5; Amici Br. at 12-19.) State Defendants and Plaintiffs also contest whether Lexington has prudential standing, i.e., whether Lexington's interests are within the "zone of interests" intended to be protected by the statute at issue. (Def. Opp. Br. at 22; Pl. Rep. Br. at 4.)

---

[13] The Court notes, however, that the "presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement[.]" Rumsfeld v. FAIR, Inc., 547 U.S. 47, 52 n.2 (2006).

The Court will address these in turn.

### i. First-Party Standing of Lexington

Amici argue that Lexington does not, in Plaintiffs' Complaint, allege a violation of its own rights. (Amici Br. at 11.) Specifically, the Complaint alleges a violation of the right to monetary bail under the Eighth Amendment (as applied to the states through the Fourteenth Amendment), a violation of due process under the Fourteenth Amendment based on an alleged deprivation of liberty to criminal defendants, and a violation of the right against unreasonable seizures under the Fourth Amendment (as applied to the states through the Fourteenth Amendment). Amici urge that "none of those claims directly addresses the rights of Lexington National," as the Eighth Amendment's excessive bail clause protects the rights of criminal defendants, the Fourteenth Amendment's "liberty clause is likewise inapplicable to corporate sureties in this context," and the Fourth Amendment claim relates to the burden on Holland of wearing a GPS monitor. (Id. at 11-12.)

The State Defendants add that Lexington lacks first-party standing because its alleged injury is not concrete and particularized, but rather is generalized and abstract, which is an injury "shared by many others in the bail bonds industry that are similarly situated." (Def. Opp. Br. at 21.) Lexington, they note, does not assert that it had an agreement in place with

Holland or any other criminal defendant to provide a bail bond, that it could not consummate due to the allegedly unlawful actions of Defendants; rather, it only asserts "that it 'likely' would have been able to help Holland post money bail." (Def. Opp. Br. at 17, citing Compl. at ¶ 5.)

In response, Plaintiffs argue that "Lexington has standing in its own right," as it has "suffered a concrete and particularized injury — the 'collapse of [its] business,' a paradigmatic economic injury.' . . . That Lexington's injury is shared by others in the industry does not make it any less cognizable." (Pl. Rep. Br. at 3-4 (internal citation omitted).)

The Court agrees with Plaintiffs that Lexington has adequately alleged a concrete and particularized injury. Plaintiffs have submitted an affidavit of Nicholas J. Wachinski, the CEO of Lexington, wherein he avers that "[t]he . . . CJRA [] has severely harmed Lexington National's business by dramatically reducing the number of defendants given the option of monetary bail and thus dramatically reducing Lexington National's opportunity to act as surety on bail bonds." (Wachinski Decl. at ¶ 9.) The Court agrees that this injury is concrete and particularized enough to constitute an injury-in-fact. See Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir. 2005) ("While it is difficult to reduce

injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms.").

However, the Court finds that Lexington does not, in fact, assert violations of its own constitutional rights that led to such an injury. The injury-in-fact requirement mandates that there be "an invasion of a legally protected interest." Lujan, 504 U.S. at 560. Cf. Danvers, 432 F.3d at 292 ("The complaint is replete with assertions of cognizable harm . . . [describing] 'Ford dealers who have suffered economic injury-in-fact as a result of . . . the invasion by Defendant . . . of its dealers' legally protected interests . . . .'"); Out Front Productions, Inc. v. Magid, 748 F.2d 166, 168 (3d Cir. 1984) (plaintiff "claims a direct economic injury traceable to defendants' actions that allegedly violated the antitrust laws."); White v. United States, 601 F.3d 545, 555 (plaintiffs "still must demonstrate an injury-in-fact to a legally protected interest"). This invasion is what must result in the injury to the plaintiff. Here, Lexington has alleged that it has been harmed. The Court nevertheless finds that the harm it has allegedly suffered is not alleged to be the result of an invasion of Lexington's legally protected interest. See Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 392 (1988) ("Even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its own rights").

The Court is persuaded that the Eighth Amendment's bail clause protects the interests of criminal defendants, not corporations who seek to provide bail bonds to them. See Johnson Bonding Co., Inc. v. Com. of Ky., 420 F. Supp. 331, 337 (E.D. Ky. 1976) (a bail bond company "does not seek to vindicate its right to be free from excessive bail. A corporation cannot go to jail. Rather, plaintiff seeks to continue in the bail bonding business") (citing United States v. Raines, 362 U.S. 17, 22 (1960) ("a litigant may only assert his own constitutional rights or immunities")); United States v. Chaplin's, Inc., 646 F.3d 846, 851 n.15 (11th Cir. 2011) (where corporation claims a court order constitutes an excessive fine in violation of the Eighth Amendment, court "assumes, but does not hold, that the Eighth Amendment applies to corporations" as the "Supreme Court has never held that this amendment applies to corporations"); see also Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 275 (1989) ("We think it clear . . . that the Eighth Amendment places limits on the steps a government may take against an individual, whether it be keeping him in prison, imposing excessive monetary sanctions, or using cruel and unusual punishments") (emphasis added). This is especially true where Lexington is not named as a criminal defendant, is not confined, and does not identify a

constitutional right that it holds as a corporation that it
seeks to vindicate.

Similarly, the Court does not see how the Due Process or
Fourth Amendment claims in Plaintiffs' Complaint constitute an
invasion of Lexington's legally-protected interests, despite the
harms to Lexington's business that will allegedly result from
the CJRA's application to Lexington's potential customers. The
Court agrees with Amici that Lexington does not "assert[] its
own constitutional rights." (Amici Br. at 12.) Accordingly, the
Court finds that Lexington lacks first-party standing on the
basis of an alleged violation of its constitutional rights.

ii. Third-Party Standing of Lexington

Defendants and Amici argue that Lexington also lacks third-
party standing. (Def. Opp. Br. at 22-23; Amici Br. at 12-19.)
Plaintiffs respond that Lexington "has third-party standing to
assert the constitutional rights of potential customers denied
bail under the CJRA." (Pl. Rep. Br. at 4-5.)

The parties agree that the Third Circuit recognizes third-
party standing, see Pa. Psychiatric Soc'y v. Green Spring Health
Servs., Inc., 280 F.3d 278, 288 (3d Cir. 2002), and that
Triplett, 494 U.S. at 720, provides an appropriate basis to
assess whether Lexington has such standing in this case.
However, the parties' argument primarily lies within the bounds
of contesting whether or not Lexington meets the standard for

third-party standing as described in Triplett, and does not fully address whether the other "preconditions" for third-party standing, as described in Pa. Psychiatric Soc'y, are met.

The Court notes at the outset that "[t]he restrictions against third-party standing do not stem from the Article III 'case or controversy' requirement, but rather from prudential concerns . . . which limit access to the federal courts to those litigants best suited to assert a particular claim." Pa. Psychiatric Soc'y, 280 F.3d at 287-88. "It is a well-established tenet of standing that a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." Id. at 288.

The Third Circuit has described third-party standing as an exception to this "well-established tenet":

> In particular, if a course of conduct prevents a third-party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement, third-party standing may be appropriate.

Pa. Psychiatric Soc'y, 280 F.3d at 288 (quoting Triplett, 494 U.S. at 720).

The parties' briefs devote substantial effort toward arguing about whether the CJRA and Defendants' alleged unlawful actions prevent criminal defendants (here, the third party) from entering into a contractual relationship with Lexington (here, the litigant), to which relationship the criminal defendants

44

have a legal entitlement. A finding of that situation might satisfy _Triplett_, but it does not end the inquiry. As the Third Circuit has stated:

> The Supreme Court has found that the principles animating these prudential concerns [about third-party standing] are not subverted if the third party is hindered from asserting its own rights and shares an identity of interests with the plaintiff. . . . More specifically, third-party standing requires the satisfaction of three preconditions: 1) the plaintiff must suffer injury; 2) the plaintiff and the third party must have a "close relationship"; and 3) the third party must face some obstacles that prevent it from pursuing its own claims. It remains for courts to balance these factors to determine if third-party standing is warranted.

_Pa. Psychiatric Soc'y_, 280 F.3d at 288-89 (internal quotations omitted); _see also_ _The Pitt News v. Fisher_, 215 F.3d 354, 362 (3d Cir. 2000) (if same three preconditions are met, "a plaintiff who meets all these criteria, but who would otherwise lack Article III standing to sue because his or her own legally protected rights were not injured, may assert the rights of a third party."); _Campbell v. Louisiana_, 523 U.S. 392, 397-98 (1998) (same "three preconditions" must be satisfied to assert the rights of a third party); _Powers v. Ohio_, 499 U.S. 400, 410-11 (1991) (same "three important criteria" must be satisfied).

Assuming, without deciding, that criminal defendants (like Holland) are prevented from entering into a contractual relationship with a bail bonds company like Lexington, and that those defendants have a constitutional entitlement to that

45

relationship and/or to monetary bail, thereby satisfying the dictates of Triplett, Lexington still does not articulate how it can satisfy the third necessary precondition to third-party standing under clear Third Circuit precedent.

As discussed above, the Court finds that Lexington has suffered an injury that gives it "a 'sufficiently concrete interest' in the outcome of the issue in dispute." Powers, 499 U.S. at 411. This satisfies the first precondition.

Whether Lexington satisfies the second precondition of a "close relationship" between the plaintiff and the third party whose rights it purports to assert is a closer question. The factual allegations here do not establish a "close relationship" in the colloquial or commonsense meaning of the phrase (as Lexington does not allege an existing contractual relationship with Holland or any criminal defendant whose rights have been violated, and avers only that it "would be ready, willing, and able to act as a bail bonds surety" for criminal defendants in New Jersey if monetary bail "were again an option" for them).[14] However, the Third Circuit has stated that "[t]o meet this standard, this relationship must permit the [proposed plaintiff]

_____

[14] The Court notes that Holland avers that "if offered the option of pre-trial release on monetary bail, [he] would have posted bail to obtain [his] pre-trial liberty" and "would have used resources of [his] own and of [his] family, and likely would have engaged a professional bondsman and insurance company." (Holland Decl. at ¶¶ 10-11.)

46

to operate fully, or very nearly, as effective a proponent of [the third parties' rights] as the [third parties] themselves." Pa. Psychiatric Soc'y, 280 F.3d at 289. Here, the Court will assume that the relationship between Lexington and the criminal defendants is sufficiently close that Lexington "could efficaciously advocate their . . . interests." Id.

However, Plaintiffs do not contend, and the Court does not see how they can do so, that the criminal defendants "face some obstacles," id., or that there is "some hindrance," Campbell, 523 U.S. at 397, in pursuing their own claims. It is undisputed that Holland is one such criminal defendant, and he has apparently faced no obstacle nor hindrance in asserting his claim that his rights were violated. Indeed, the Court has already found that Holland has standing under Article III. See Section IV.A.1.a, supra. Holland is a named plaintiff in this action and has been pursuing claims that his constitutional rights were violated with strength and vigor. The Court cannot discern a basis, then, to allow for third-party standing for Lexington (as a matter of prudential standing, rather than Article III standing), where the "third party" is actually a named plaintiff actively participating in the instant case.

Accordingly, the Court finds, at the present juncture, that it appears unlikely that Lexington has satisfied the necessary

preconditions to establish third-party standing in this action.[15]
However, as noted above, the Court may nevertheless proceed in
its assessment of the arguments on the merits as the "presence
of one party with standing is sufficient to satisfy Article
III's case-or-controversy requirement[.]" Rumsfeld, 547 U.S. at
52 n.2. Holland has such standing.

### iii. Prudential Standing

Finally, the State Defendants urge that Lexington lacks
prudential standing in another respect: namely, that the injury
to Lexington "fall[s] well outside the zone of interests of the
Eighth, Fourteenth, and Fourth Amendments[.]" (Def. Opp. Br. at
22.)

In response, Plaintiffs argue that "the Supreme Court
recently disavowed the 'zone-of-interests test' as a prudential
standing requirement, holding instead that a court must
determine 'whether a legislatively conferred cause of action
encompasses a particular plaintiff's claim.'" (Pl. Rep. Br. at
4, quoting Lexmark Int'l, Inc. v. Static Control Components,
Inc., 134 S. Ct. 1377, 1387 (2014).)

---

[15] The Court expects that the parties will more completely
address the issue of Lexington's third-party standing and the
implications of the preconditions described in the Supreme
Court's precedents in Powers and Campbell and the Third
Circuit's precedent in Pa. Psychiatric Soc'y when briefing
Defendants' Motion to Dismiss. See FN 11, supra.

"Unlike constitutional standing, which involves absolute and irrevocable justiciability requirements under Article III, prudential standing is a judicially created doctrine relied on as a tool of 'judicial self-governance.'" Prime Media, Inc. v. City of Brentwood, 485 F.3d 343, 349 (6th Cir. 2007) (quoting Warth v. Seldin, 422 U.S. 490, 500 (1975)).

The Third Circuit has recently stated:

> We have previously categorized the zone-of-interests requirement as one of three components of prudential standing. . . . The other two components of prudential standing are that a plaintiff must first "assert his or her own legal interests rather than those of third parties," and second must not assert "generalized grievances" that require courts to "adjudicat[e] abstract questions."

Maher Terminals, LLC v. Port Auth. of N.Y. and N.J., 805 F.3d 98, 105, 105 n.5 (3d Cir. 2015) (internal citations omitted). The "zone-of-interests" test requires that "the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question[,]" Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 475 (1982) (internal quotations omitted), and the plaintiff "must show that his interests are more than 'marginally related to . . . the purposes implicit in the statute'" or law, Programmers Guild, Inc. v. Chertoff, 338 Fed. App'x 239, 242 (3d Cir. 2009) (citing Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399-400 (1987)).

In Lexmark, however, the Supreme Court stated: "Although we admittedly have placed [the zone-of-interests] test under the 'prudential [standing]' rubric in the past, . . . it does not belong there . . . . Whether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." 134 S. Ct. at 1387 (internal quotations omitted). Interpreting Lexmark, the Court has recently stated:

> This Court has also referred to a plaintiff's need to satisfy "prudential" or "statutory" standing requirements. See Lexmark, . . . 134 S. Ct. at 1387 and n.4. In Lexmark, we said that the label "prudential standing" was misleading, for the requirement at issue is in reality tied to a particular statute. Ibid. The question is whether the statute grants the plaintiff the cause of action that he asserts. In answering that question, we presume that a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Id. at 1388.

Bank of Am. Corp v. City of Miami, 137 S. Ct. 1296, 1302 (2017) (emphasis added).

The Third Circuit has said that "Lexmark strongly suggests that courts shouldn't link the zone-of-interests test to the doctrine of standing," but has applied the zone-of-interests test to discern whether a plaintiff adequately states a claim under a particular statute. See Maher, 805 F.3d at 105-06, 110 ("[W]hile we hold that the District Court should not have

couched its conclusion in terms of standing after Lexmark, we agree with the District Court's essential holding: Maher, as a landside entity, is outside the Tonnage Clause's zone of interests. . . . Accordingly, Maher failed to state a Tonnage Clause claim.").

The Third Circuit has thus maintained that the zone-of-interests test has continued vitality, but with regard to whether a plaintiff states a claim, rather than whether that plaintiff has standing. Id. at 110. In light of that, the Court declines to find that Lexington lacks prudential standing under the "zone-of-interests" test.[16]

2. *Younger* Abstention

Defendants argue that the Court must abstain from interfering with Holland's ongoing state criminal prosecution, pursuant to Younger v. Harris, 401 U.S. 37 (1971). (Def. Opp. Br. at 23.) In response, Plaintiffs argue that Younger abstention is inappropriate where a defendant in state court does not challenge the state prosecution as such, but rather pre-trial procedures, citing Gerstein v. Pugh, 420 U.S. 103, 108 n.9. (Pl. Rep. Br. at 6.)

---

[16] Defendants are, of course, free to re-assert this zone-of-interests argument as part of an argument that Lexington fails to state a claim. The Court expresses no opinion on the merits of such a potential issue.

In _Younger_, the Supreme Court held that "settled doctrines
. . . have always confined very narrowly the availability of
injunctive relief against state criminal prosecutions." 401 U.S.
at 53. It found that an injunction was inappropriate where the
state-court defendant claimed that a statute on its face
violated his constitutional rights, but where "there [wa]s no
suggestion that this single prosecution against Harris [wa]s
brought in bad faith or [wa]s only one of a series of repeated
prosecutions to which he [would have] be[en] subjected," which
would constitute "extraordinary circumstances" and justify a
departure from those "settled doctrines." _Id._ at 49, 53.
Furthermore, "a proceeding was already pending in the state
court, affording Harris an opportunity to raise his
constitutional claims." _Id._ at 49. The Supreme Court has stated
that "[t]he policy of equitable restraint expressed in _Younger_
_v. Harris_, in short, is founded on the premise that ordinarily a
pending state prosecution provides the accused a fair and
sufficient opportunity for vindication of federal constitutional
rights." _Kugler v. Helfant_, 421 U.S. 117, 124 (1975) (citing
_Steffel v. Thompson_, 415 U.S. 452, 460 (1974)).

In _Gerstein v. Pugh_, 429 U.S. 103 (1975), however, the
Supreme Court arguably narrowed the scope of _Younger_ abstention.
In that case, the state-court defendant Pugh requested
injunctive relief from a federal district court, claiming a

constitutional right to a judicial hearing on the issue of probable cause, and asking the court to order such a hearing. 420 U.S. at 106-07. "The District Court ordered the Dade County defendants to give the named plaintiffs an immediate preliminary hearing to determine probable cause for further detention." Id. at 107-08.

The Court then noted:

> The District Court correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions, Younger v. Harris, 401 U.S. 37 (1971). The injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits.

Id. at 108 n.9.

Other courts have since relied on the distinction articulated in Gerstein at Note 9 as to whether abstention pursuant to Younger is appropriate.

Shortly after Gerstein was decided, the Third Circuit found a district court's abstention pursuant to Younger to be appropriate, and directly addressed the applicability of Note 9 in Gerstein, where the state-court defendant sought a federal injunction prohibiting "sessions on Friday, the Islamic Sabbath of appellant, in a pending criminal trial in state court when available state procedures to remedy the alleged constitutional

infringement have not been exhausted." <u>State of N.J. v.</u>
<u>Chesimard</u>, 555 F.2d 63, 64 (3d Cir. 1977).

In that case, the state-court defendant's "free exercise
right could not be asserted as a defense to the criminal
prosecution[,]" but it was "equally true that the right could
not be raised in the absence of a criminal prosecution" and was

> in fact . . . asserted as part of an ongoing criminal
> prosecution. Ms. Chesimard raised her free exercise
> claim by pre-trial motion in the state court. Although
> the state system provides for interlocutory review of
> the adverse ruling she received, Ms. Chesimard has
> chosen not to pursue her available state remedies to
> their fullest extent. Under these circumstances, we
> believe the federal hand must be stayed[, pursuant to
> <u>Younger</u> and . . . ] <u>Huffman v. Pursue, Ltd.</u>, 420 U.S.
> [592,] 609 [(1975)].

<u>Chesimard</u>, 555 F.2d at 66-67. The court in <u>Chesimard</u> also noted
that its decision does not

> under these circumstances do violence to the
> traditional notion that exhaustion of state judicial
> remedies is ordinarily not a prerequisite to relief
> sought under 42 U.S.C. § 1983 . . . . [The holding in
> <u>Monroe v. Pape</u>, 365 U.S. 167, 183 (1967), that] "one
> seeking redress under . . . § 1983 for a deprivation
> of federal rights need not first initiate state
> proceedings based on related state causes of action .
> . . ha[s] nothing to do with the problem presently
> before us, that of the deference to be accorded to
> state proceedings which already have been initiated
> and which afford a competent tribunal for the
> resolution of federal issues.

<u>Chesimard</u>, 555 F.2d at 67 (citing <u>Huffman</u>, 420 U.S. at 609
n.21).

Furthermore, the Chesimard Court found Gerstein inapposite; although "[p]ersuasive arguments can be made on either side" as to the issue it saw as dispositive under Gerstein of whether an order prohibiting trial on Fridays "would 'prejudice the conduct of the trial on the merits,' [Gerstein,] 420 U.S. at 108, n.9," the Third Circuit ruled that "to permit federal intervention here when state interlocutory appellate review remains available would unnecessarily displace the state's supreme court of its role in supervising the conduct of trials in state courts. . . . [T]he intervention here would deprive the New Jersey Supreme Court of an opportunity to review a discrete judicial ruling in a pending trial[,]" and found that Younger "is applicable in the present posture of the case." Chesimard, 555 F.2d at 68.[17]

In a different and more recent case, however, the Third Circuit has applied Gerstein and Younger and found abstention

---

[17] See also Wallace v. Kern, 520 F.2d 400, 405-08 (2d Cir. 1975) (analyzing Note 9 of Gerstein in case where plaintiffs sought new bail procedures and finding that Gerstein was distinguishable because the Gerstein Court "emphasize[d]" that the plaintiffs there had effectively unavailable remedies under state law to press their constitutional claim and because the Gerstein plaintiffs' claims had been repeatedly rejected by Florida courts; and abstaining pursuant to Younger, stating that upholding the lower court's injunction would constitute "federal judicial legislation which is not only offensive to state sensibilities but is contrary to the admonition in Gerstein on this very point[, citing Gerstein, 420 U.S. at 123: '[W]e recognize that state systems of criminal procedure vary widely. There is no single preferred pretrial procedure . . . [and] we recognize the desirability of flexibility and experimentation by the States.']").

inappropriate in a case where "the equitable relief requested is not aimed at state prosecutions, but at the legality of the re-arrest policy and the pretrial detention of a class of criminal defendants. The issues here raised could not have been raised in defense of [the plaintiff's] criminal prosecution, and the injunction sought would not bar his prosecution." Stewart v. Abraham, 275 F.3d 220, 225 (3d Cir. 2001). The Third Circuit also cited Moore v. Sims, 442 U.S. 415 (1979), in which the Supreme Court "distinguished Gerstein from the case before it" on the basis that, in Gerstein, "the action was not barred by Younger because the injunction was not addressed to a state proceeding and therefore would not interfere with the criminal prosecutions themselves. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." Stewart, 275 F.3d at 226 (quoting Moore, 442 U.S. at 431) (internal quotations omitted).[18]

---

[18] But see Moore, 442 U.S. at 430 n.12 ("In sum, the only pertinent inquiry [as to whether a federal court ought interject itself into a constitutional dispute in state court regarding a state law] is whether the state proceedings afford an adequate opportunity to raise the constitutional claims, and Texas law appears to raise no procedural barriers. . . . The proposition that claims must be cognizable 'as a defense' in the ongoing state proceeding, as put forward by our dissenting Brethren . . . converts a doctrine with substantive content into a mere semantical joust. There is no magic in the term 'defense' when used in connection with the Younger doctrine if the word 'defense' is intended to be used as a term of art. We do not here deal with the long-past niceties which distinguished among 'defense,' 'counterclaims,' 'setoffs,' 'recoupments,' and the

Younger abstention has been expanded over the years from
its original context in criminal proceedings to apply in other
types of proceedings. See Huffman, 420 U.S. at 604 (abstention
under Younger appropriate in state civil proceeding that is
"both in aid of and closely related to criminal statutes" and
where state's interest "is likely to be every bit as great as it
would be . . . [in] a criminal proceeding"); Trainor v.
Hernandez, 431 U.S. 434, 441, 444 (1975) ("[T]he principles of
Younger and Huffman are broad enough to apply to interference by
a federal court with an ongoing civil enforcement action such as
this [for the return of money obtained via alleged welfare
fraud], brought by the State in its sovereign capacity[,]" for
reasons of federalism and comity); Pennzoil Co. v. Texaco, Inc.,
481 U.S. 1, 10-14 (1987) (abstention under Younger appropriate
with regard to state civil proceedings that seek to enforce the
orders and judgments of the state's courts).

---

like. As we stated in Juidice v. Vail, 430 U.S. [327,] 337
[(1977)]: 'Here it is abundantly clear that appellees had an
opportunity to present their federal claims in the state
proceedings. No more is required to invoke Younger abstention. .
. . Appellees need be accorded only an opportunity to fairly
pursue their constitutional claims in the ongoing state
proceedings . . . and their failure to avail themselves of such
opportunities does not mean that the state procedures were
inadequate.'") (omissions and emphasis in original).

In response to this, the Supreme Court has recently described at greater length the limited circumstances when it is appropriate for a lower court to invoke <u>Younger</u> abstention:

> In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter. . . . <u>Younger</u> exemplifies one class of cases in which federal-court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution. . . . Circumstances fitting within the <u>Younger</u> doctrine, we have stressed, are "exceptional"; they include, as catalogued in [<u>New Orleans Public Service, Inc. v. Council of City of New Orleans</u>, 491 U.S. 350 (1989) ("NOPSI")], "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." <u>Id.</u> at 367-68.

<u>Sprint Commc'ns, Inc. v. Jacobs</u>, 134 S. Ct. 584, 588 (2013).

The Third Circuit has stated that "<u>Sprint</u> offers a forceful reminder of the longstanding principle that federal courts have a 'virtually unflagging' obligations to hear and decide cases within their jurisdiction." <u>ACRA Turf Club, LLC v. Zanzuccki</u>, 748 F.3d 127, 138 (3d Cir. 2014) (quoting <u>Sprint</u>, 134 S.Ct. at 591, and <u>Colo. River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 817 (1976)).

The Third Circuit has also stated:

> In <u>Middlesex[ Cty. Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423 (1982)], the Court noted that abstention is appropriate where there is an ongoing state proceeding that (1) is judicial in nature, (2)

implicates important state interests, and (3) provides
an adequate opportunity to raise federal challenges.
Middlesex, 457 U.S. at 432. . . .

In Sprint, the Court repudiated th[e] practice [in
subsequent decisions of lower courts of "exclusively
applying these three factors as if they were the alpha
and omega of the abstention inquiry"], explaining that
the Middlesex conditions were never intended to be
independently dispositive, but "were, instead,
additional factors appropriately considered by the
federal courts before invoking Younger." Sprint, 134
S. Ct. at 593 (emphasis in original).

Gonzalez v. Waterfront Comm'n of N.Y. Harbor, 755 F.3d 176, 181

(3d Cir. 2014).[19] Thus, Gonzalez ratifies the continuing validity

of Younger abstention in the context of an ongoing criminal

prosecution where there is no barrier to raising the issue in

the state court proceeding, suggesting also the continuing

validity of the Middlesex analysis.

No Third Circuit case of which this Court is aware has

directly addressed the issue of whether Younger abstention is

_____

[19] In Gonzalez, the Third Circuit found that abstention was
appropriate in part because, having found that the proceeding at
issue was quasi-criminal under Sprint, the third Middlesex
factor was also satisfied:

In determining whether a federal plaintiff has an
adequate opportunity to raise his constitutional
claims during state-court judicial review of the
administrative decision, we ask whether "state law
clearly bars the interposition of the constitutional
claims." Moore v. Sims, 442 U.S. 415, 425-26 (1979)
(emphasis added [in Gonzalez]). In making this
determination, we consider whether state law raises
procedural barriers to the presentation of the federal
challenges.

Gonzalez, 755 F.3d at 184.

appropriate with regard to ancillary or collateral proceedings
in a pending criminal case since Sprint was decided. Other
federal courts, in cases both before and after Sprint, have
ruled that abstention is inappropriate in cases challenging bail
or other pretrial release conditions. See Hunt v. Roth, 648 F.2d
1148, 1154 (8th Cir. 1981) (rev'd on other grounds) (abstention
inappropriate where declaratory judgment sought regarding non-
bailable status of certain offenses did "not interfere with the
state's orderly criminal prosecution" of plaintiff, plaintiff's
claim that "bail has been unconstitutionally denied [wa]s no
defense to the criminal charge[,]" and plaintiff had effectively
no remedy in state court); Odonnell v. Harris Cty., Texas, 227
F. Supp. 3d 706, 734-35 (S.D. Tex. 2016) ("Resolving [the
legality of the challenged pre-trial detention] does not affect
the merits of subsequent criminal prosecutions. The inability to
pay bail cannot be raised as a defense in a subsequent criminal
prosecution. . . . Even if Younger applied to a case challenging
pretrial detention, this case would fail Younger's conditions
for abstention [under Middlesex, 457 U.S. at 432 and subsequent
caselaw.]"); Rodriguez v. Providence Cmty. Corr., Inc., 155 F.
Supp. 3d 758, 765-66 (M.D. Tenn. 2015) (noting that the "Sixth
Circuit has read Gerstein to require federal courts to ask
'whether the issue raised is collateral to the principal state

proceeding' before invoking <u>Younger</u> abstention") (quoting <u>Parker</u> <u>v. Turner</u>, 626 F.2d 1, 8 (6th Cir. 1980)).

Ultimately, the Court is not persuaded that <u>Younger</u> abstention is warranted in the instant case. As the <u>Sprint</u> Court stated: "When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution." 134 S. Ct. at 588. Plaintiffs, here, do not seek to enjoin the state prosecution against Holland; instead, they challenge the procedure by which the conditions of pre-trial release during that prosecution was decided and seek an injunction ordering a different procedure. An injunction containing an order for such a procedure to take place "could not prejudice the conduct of the trial on the merits." <u>Gerstein</u>, 420 U.S. at 108 n.9.

The Court believes that <u>Gerstein</u>'s explication of when <u>Younger</u> abstention is inappropriate is as applicable to the instant case as it was to the claims in <u>Stewart</u>. In that case, the petitioners' claims were regarding a policy of the Philadelphia District Attorney's Office re-initiating felony charges that had been dismissed by a judge for lack of a prima facie showing of probable cause, such policy alleged to have been in violation of the petitioners' Fourth Amendment rights against unreasonable seizures. <u>Stewart</u>, 275 F.3d at 225-26. Just as the federal court addressing the challenged procedure in

_Stewart_ "would not interfere with the criminal prosecutions themselves" as the claims there "involved a challenge to pretrial restraint," _id._ at 226 (internal quotations omitted), the Court here likewise finds that _Gerstein_ is applicable and it is likely that abstention pursuant to _Younger_ is not warranted.[20] The matter of _Younger_ abstention's propriety, however, is not well-settled, even after _Sprint_, in light of _Gonzalez_ and cases discussed above. While the relief sought would not restrain the state's prosecution of Holland, it is nonetheless troubling that Holland continues to have an unused remedy to present these issues in an effort to challenge the conditions of release in his case, and further, that the Plaintiffs are asking this federal court to rearrange the state's statutory (and to some extent, constitutional) considerations in the determination of conditions of release having broad application across all criminal cases, which invades important state interests concerning release and detention.

---

[20] _But_ _see_ _McWhite v. Cohen_, No. 15-6702, 2015 WL 5996296, *3 (D.N.J. Oct. 14, 2015) ("Petitioner has the opportunity to raise his constitutional claims in pre-trial motions, and in a direct appeal and/or a post-conviction relief petition should the need arise. Petitioner therefore has ample opportunity to present his federal constitutional claims [including his excessive bail complaint] to the state courts. Accordingly, the Court must abstain from interfering with the ongoing state proceedings under _Younger_.")

3. <u>Habeas vs. 1983</u>

The parties have also addressed whether the claims of Holland are appropriately presented under 42 U.S.C. § 1983, rather than 28 U.S.C. § 2241. The most salient difference is that relief under § 2241 requires a plaintiff to have exhausted state remedies before seeking federal relief, while § 1983 has no such exhaustion requirement. Plaintiffs argue that § 1983 is the proper basis for this action because here, Holland does not seek "an injunction ordering his immediate or speedier release into the community." (Pl. Rep. Br. at 7-8.) Defendants argue that inasmuch as the restrictions on Holland's pre-trial release either constitute or are viewed by him as "a form of pretrial custody or confinement," a petition for a writ of habeas corpus is the only avenue for him to seek relief. (Def. Opp. Br. at 25-26.)

The Court finds that § 1983 is an appropriate basis for this action. In <u>Preiser v. Rodriguez</u>, the Court found that a plaintiff could only seek a federal remedy via the writ of habeas corpus, and not § 1983, when that person "is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment." 411 U.S. 475, 500 (1973); <u>see</u> <u>also</u> <u>Wallace v. Fegan</u>, 455 Fed. App'x 137, 140 (3d Cir. 2011) (plaintiff's "seeming challenge to

pretrial incarceration seeks a remedy available only in habeas").

While the Supreme Court has previously held that a petitioner is sufficiently "in custody" for purposes of habeas corpus even when released on his or her own recognizance, Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 300-01 (1984), the availability of § 1983 as a vehicle to seek relief for an alleged violation of a constitutional right depends, primarily, on the relief sought.

As the Third Circuit has stated:

The Court has been careful to distinguish cases seeking release, which must be brought by writ of habeas corpus, from those challenging procedures, which may go forward under § 1983. Thus, in Wolff v. McDonnell, 418 U.S. 539, 554-55 (1974), the Court held that although an action seeking restoration of good time credits could be brought only as a petition for habeas corpus, a litigant could sue for damages and injunction under § 1983 based on a claim that good time credits were lost without proper procedural protections. In Gerstein v. Pugh, 420 U.S. 103, 107 n.6 (1975), the Court noted that where the relief sought was a hearing, not release from confinement, the action need not be brought as a habeas corpus petition."

Georgevich v. Strauss, 772 F.2d 1078, 1086 (3d Cir. 1985). The Third Circuit, further discussing the posture of Gerstein, stated:

It is also well-established that some kinds of procedural challenges in criminal cases can be asserted in a § 1983 action where release from custody is not the relief sought. Thus, in Gerstein . . . , the Court approved extensive declaratory and

64

> injunctive relief in a § 1983 class action challenging
> the constitutionality of state statutes and procedural
> rules which permitted pre-trial detention of arrestees
> without any probable-cause determination by a neutral
> and detached magistrate. . . . [In that case,] the
> constitutional validity of a method of pretrial
> procedure, rather than its application to any
> particular case, was the focus of the challenge. . . .
> [I]n any event, the validity of the criminal
> convictions (of those members of the class who were
> thereafter convicted), would not be affected by the
> unconstitutionality of the pretrial procedure in
> question.

Tedford v. Hepting, 990 F.2d 745, 748-49 (3d Cir. 1993).

The Supreme Court has recently stated that where a petitioner does not seek an "injunction ordering . . . immediate or speedier release into the community . . . and a favorable judgment would not necessarily imply the invalidity of their convictions or sentences," he or she may "properly invoke[] § 1983." Skinner v. Switzer, 562 U.S. 521, 533-34 (2011) (citing Wilkinson v. Dotson, 544 U.S. 74, 82 (2005) and Heck v. Humphrey, 512 U.S. 477, 487 (1994)) (internal quotations omitted).

The Court finds that Holland does not seek an injunction ordering his immediate or speedier release into the community, but rather an injunction ordering a hearing that conforms to his conception of his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments. Nor would a favorable judgment necessarily (or in any way, in fact) imply the invalidity of any subsequent conviction or sentence to which

Holland may one day be subjected. For this reason, the Court finds that Plaintiffs have properly invoked § 1983 and need not proceed exclusively through a petition for a writ of habeas corpus, and declines to dismiss their claims on that ground.

### 4. Summary of Preliminary Issues

At this stage, as discussed above, Holland has standing to raise these constitutional challenges while Lexington lacks first-party standing and it is unlikely Lexington has third-party standing. Similarly, it appears <u>Younger</u> abstention would not be warranted as to either Plaintiff, although the issue presents a closer call in Holland's case because his criminal case remains pending and he has an available state court forum to raise challenges to his conditions of release and the CJRA, but the relief he seeks in federal court would not block or call into question the state's prosecution. Finally, the Court does not find that it should exercise habeas corpus jurisdiction under 28 U.S.C. § 2241 rather than federal civil rights jurisdiction under 28 U.S.C. §§ 1343 & 1983. Doubt as to Lexington's standing suggests further caution in considering Lexington's prospects of success on the merits of its claims.

**B.   Likelihood of Success on the Merits**

With respect to the first factor in obtaining a preliminary injunction, Plaintiffs must demonstrate a likelihood of success

on the merits of their Eighth Amendment, Fourteenth Amendment, and Fourth Amendment claims. The Court addresses each in turn.[21]

1. Eighth Amendment

Plaintiffs first ask the Court to declare that the CJRA violates the Eighth Amendment rights of Holland and other presumptively innocent criminal defendants. Plaintiffs argue that the CJRA's hierarchical structure violates the Eighth Amendment because it essentially "single[s] out" monetary bail "as a disfavored option of last resort." (Pl. Rep. Br. at 1.) As the CJRA currently stands, Plaintiffs argue, defendants in New Jersey are left without the "liberty-preserving option" of paying monetary bail, since a judge cannot advance to the monetary bail step without first finding that the enumerated non-monetary conditions would not "reasonably assure the eligible defendant's appearance in court when required." N.J.S.A. 2A:162-17(c)(1).  To remedy this alleged constitutional

---

[21] Plaintiffs attack the CJRA in the form of both a facial and an as-applied challenge. A party asserting a facial challenge "must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). That is, Holland would have to show that the "[statute] is unconstitutional in all of its applications." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008) (citing Salerno, 481 U.S. at 745). This is the "most difficult challenge to mount successfully." Salerno, 481 U.S. at 745. On the other hand, "[a]n as-applied attack ... does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010).

defect, Plaintiffs ask the Court to elevate the third level

("release on monetary bail – but only to reasonably assure the

defendant's appearance in court," N.J.S.A. 2A:162-16(b)(2)(c), –

17(c), up to the second level (release on non-monetary

conditions that are the least restrictive conditions necessary,

N.J.S.A. 2A:162-16(b)(2)(c), – 17(b)), so that a judge can

consider both monetary and non-monetary options at the same

time. In simple terms, Holland believes he is entitled under the

Eighth Amendment to have <u>monetary</u> bail be considered as part of

the mix of the judge's pretrial release decision.

In relevant part, the Eighth Amendment of the U.S.

Constitution provides that "[e]xcessive bail shall not be

required." U.S. Const. amend. VIII [hereinafter, "Excessive Bail

Clause"]. The Eighth Amendment's prohibition against excessive

bail is applicable to the states through the due process clause

of the Fourteenth Amendment. <u>Kennedy v. Louisiana</u>, 554 U.S. 407,

419 (2008); <u>Sistrunk v. Lyons</u>, 646 F.2d 64, 70 (3d Cir. 1981).

Plaintiffs argue that the Eighth Amendment's prohibition

of "[e]xcessive bail" presupposes a right to bail as an

alternative to pretrial deprivation of liberty for bailable

offenses, and the CJRA impermissibly forecloses monetary bail as

an option. (Pl. Br. at 21.) In other words, if the Bail Clause

of the Eighth Amendment is to have any meaning, it must create a

constitutional right to bail. Defendants respond that Plaintiffs

improperly "transmogrify a prohibition on imposing excessive bail into a generalized right to monetary bail as an alternative to pre-trial deprivation of liberty for bailable offenses." (Def. Opp. Br. at 28) (internal references omitted).

At the outset, the Court finds that Plaintiffs' argument that the Eighth Amendment implies and safeguards the right to monetary bail is unlikely to succeed on the merits.

The history of the Excessive Bail Clause demonstrates Plaintiffs are unlikely to succeed on the merits of their Eighth Amendment claim. The Excessive Bail Clause was derived from the English Bill of Rights of 1688 and the 39th chapter of the Magna Carta, which required that "no freeman shall be arrested, or detained in prison . . . unless . . . by the law of the land." Cobb v. Aytch, 643 F.2d 946, 959 n.7 (3d Cir. 1981). When Congress considered adoption of the Bill of Rights in 1789, the Excessive Bail Clause "was a noncontroversial provision that provoked very little discussion." United States v. Edwards, 430 A.2d 1321, 1328 (D.C. 1980)(en banc), cert. denied, 455 U.S. 1022 (1982). As the Edwards Court found, "neither the historical evidence nor contemporary fundamental values implicit in the criminal justice system requires recognition of the right to bail as a 'basic human right,' which must then be construed to be of constitutional dimensions." Id. at 1331 (citations omitted). However, "[t]he specific intent of the Framers simply

cannot be divined from the historical evidence of the pre-1789 period," as "the only reasonable conclusion that can be drawn . . . is that the Framers did not consider the parameters of a right to bail at all when they passed the [E]ighth [A]mendment." Donald B. Verrilli, Jr., Note, The Eighth Amendment and the Right to Bail: Historical Perspectives, 82 Colum. L. Rev. 328, 350 (1982). Indeed, many states, including New Jersey, added an affirmative right to bail clause to their constitutions after 1789. See, e.g., N.J. Const. of 1844, art. I, ¶ 10.

Plaintiffs provide a robust history outlining the importance of a criminal defendant's right to bail. Notably, they fail to explain why the Court should find an implied right to monetary bail in the Eighth Amendment, as opposed to a general right to be free from unwarranted custody pending trial. In fact, bail has traditionally been defined in a multitude of ways, including:

(1) a security such as cash, a bond, or property; esp., security required by a court for the release of a criminal defendant who must appear in court at a future time;

(2) **the process by which a person is released from custody either on the undertaking of a surety or on his or her own recognizance;**

(3) release of a criminal defendant on security for a future court appearance; esp., the delivery of a person in custody to a surety; and

(4) one or more sureties for a criminal defendant.

_Bail_, Black's Law Dictionary (9th ed. 2009) (emphasis added). While some of these definitions involve money, others (notably the second definition) do not.

The Third Circuit has addressed the availability of bail in the context of the Eighth Amendment, but all before the landmark case of _United States v. Salerno_, 481 U.S. 739 (1987), and in slightly different contexts than the present case.[22] To the extent Plaintiffs rely upon these cases for the proposition that there is an implied right to money bail under the Eighth Amendment, the Court finds that _Salerno_ is the best indication of how the Supreme Court currently views the issue of bail. In _Salerno_, the Supreme Court held that the Eighth Amendment "says nothing about whether bail shall be available at all." _Salerno_, 481 U.S. at 752. And the Third Circuit has not reached the issue since. Accordingly, the Court declines plaintiff's invitation to

---

[22] _See_ _e.g._, _United States v. Perry_, 788 F.2d 100, 111 (3d. Cir. 1986) (finding that, in the civil, preventative-detention context, "[i]t seems more reasonable . . . to consider the bail clause to be applicable solely to the problem it most clearly addresses: conditions of release or detention designed to assure a criminal defendant's appearance at trial and availability for sentence.") _Sistrunk v. Lyons_, 646 F.2d 64, 65 (3d Cir. 1981) (recognizing in  a capital murder case that, while "bail constitutes a fundament of liberty underpinning our criminal proceedings" and "has been regarded as elemental to the American system of jurisprudence[,] . . . the Constitution does not provide a right to bail per se to which the states must conform, it only sets a ceiling on its employment").

find that a right to money bail is implied within the Eighth Amendment.

Plaintiffs further argue that the CJRA violates the Eighth Amendment because New Jersey cannot impose "severe" deprivations of liberty, like home detention and electronic monitoring, without offering the possibility of money bail. (Pl. Rep. Br. at 20.)[23] In other words, they argue, the state cannot put monetary bail "behind an emergency glass," unable to be employed until all other non-monetary options are exhausted. Defendants respond that conditions like home detention and electronic monitoring are not "severe," since such conditions are less restrictive than jail and are "commonly imposed in the federal bail system." (Def. Opp. Br. at 32.)

Salerno articulates the constitutional principles governing the use of preventive detention in the pretrial context, and provides support for the constitutionality of the CJRA. 481 U.S. at 739. Salerno concerned a facial attack on the federal Bail Reform Act of 1984, which requires courts to detain arrestees charged with certain serious felonies prior to trial, if the

---

[23] Plaintiffs conceded at oral argument that they would have a "weaker argument" if the issue was a right to a commercial bond versus the availability of a bond generally. [Docket Item 42.] Thus, it appears that Plaintiffs do not quibble with the way that money bail would be provided, just that some monetary condition will be in the mix and be part of a state court judge's analysis and determination of appropriate conditions of pretrial release.

Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In upholding the constitutionality of the Bail Reform Act, the Salerno Court emphasized that preventative detention that is "regulatory, not penal" does not constitute "impermissible punishment before trial." Id. at 746-47. The test for determining whether a preventive detention policy is regulatory or punitive depends, first, on whether there was an express legislative intent to punish; if not, the inquiry turns to whether there is a rational connection between the policy and a non-punitive justification, and then, whether the policy is proportional to that justification. Id. at 747. The Court found that the Bail Reform Act was more regulatory in nature, as it "carefully limits the circumstances under which detention may be sought to the most serious of crimes." Id. at 739-40. The Court then decided that the restrictions the statute imposed on pretrial liberty could be adequately justified by the compelling government interest in preventing danger to the community. Id. at 747.

Notably, the Court "reject[ed] the proposition that the Eighth Amendment categorically prohibits the government from pursuing other admittedly-compelling interests through

regulation of pretrial release." Id. at 753. The Court explained that "[t]here is no doubt that preventing danger to the community is a legitimate regulatory goal." Id. at 747. Additionally, "[n]othing in the text of the Bail Clause limits permissible considerations solely to questions of flight." Id. at 754. Importantly, the Supreme Court in Salerno thus recognized that the legislature can identify interests, such as assuring the safety of the community and persons, including victims or witnesses, which are considered in determining conditions of release aside from the setting a monetary bail.

Plaintiffs argue that "nothing in Salerno provides any support for the CJRA's sweeping provisions authorizing severe liberty restrictions of non-dangerous defendants – i.e., anyone charged with a covered crime whose risk of flight can be negated through house arrest and an ankle monitor." (Pl. Rep. Br. at 14.) But Plaintiffs have not cited a single post-Salerno bail case mandating monetary bail, let alone one finding that non-monetary conditions cannot be utilized by a judge when considering the pretrial release of a criminal defendant. This is not surprising; if absolute pretrial detention is constitutionally permissible to address risk of flight and safety of persons and community, then so too are lesser conditions imposing restrictions on pre-trial liberty.

Further, the Court has serious doubts that Holland is the appropriate plaintiff to advance such an argument, as he appears to be a far cry from the hypothetical non-violent defendant to whom Plaintiffs allude. Holland was arrested after a serious bloody assault in which he allegedly inflicted multiple facial fractures upon the victim, then fled the scene before police arrived, and was charged with second-degree aggravated assault. As a result of this violent criminal charge and a prior simple assault conviction, the DMF generated by the Pretrial Services Program recommended that Holland be detained pending trial. Only after negotiations between the prosecutor and Holland's court-appointed attorney was the judge willing to release Holland subject to house arrest, electronic monitoring, and weekly reporting. It therefore appears that flight risk was not a primary consideration for Holland's conditions of pretrial release. Rather, Holland was considered to be a potentially-dangerous defendant from whom the community deserved some degree of protection by certain non-monetary conditions of release or, indeed, by his detention.

More importantly, Holland waived his claims to have money bail be considered as one possible condition for his pretrial release when he agreed to accept PML Level 3+ monitoring in exchange for the prosecution dropping its request for detention. Holland argues that he and his attorney made this agreement

before his pretrial detention hearing because he had no other choice given the unconstitutional system. This rings hollow. Holland had a full opportunity to dispute the PSA's recommendation of pretrial detention, including the NVCA flag he received. Indeed, the Pretrial Services Program's recommendation is one of several factors a court may consider at the pretrial detention hearing. See N.J.S.A. 2A:162-20. Holland and his attorney had the opportunity to argue against the prosecutor's motion, to point out why detention or home confinement with electronic monitoring was too restrictive, and why lesser conditions would suffice. Holland did none of that in the Superior Court.

A judge has wide discretion under the CJRA framework to impose the least-restrictive, non-monetary condition warranted under the circumstances. While Holland agreed to electronic monitoring and home detention in this instance, if he had proceeded with his pretrial detention hearing, he may well have received non-monetary conditions that were less stringent than those he agreed to. This could have included phone reporting at PML 1, or reporting once a month in person or telephone and some monitored conditions, such as curfew, at PML 2. In fact, given Holland's initial PSA score of 2/6 for failure to appear and 2/6 for new criminal activity, it is possible that Holland could have been released on his own recognizance with lesser

restrictions if he had been able to successfully challenge the NVCA flag he received in his PSA.

Holland had a right to be released from jail under conditions that were not excessive. Nothing in the record suggests that Holland waived his right to a pretrial detention hearing because he was proffering a money bail as an alternative to home confinement or electronic monitoring; instead, it appears he waived it because he faced the very real possibility of going to jail as a pretrial detainee otherwise, given the state's allegations of dangerousness. For all these reasons, the Court finds that Plaintiffs are unlikely to succeed on the merits of their Eighth Amendment claim.

2. <u>Fourteenth Amendment</u>

In the alternative, Plaintiffs ask the Court to declare that the CJRA violates the procedural and substantive due process rights of Holland and other presumptively innocent criminal defendants by denying these individuals the option of monetary bail as a means to assure their appearance at trial before subjecting them to "severe" restrictions of their pretrial liberty.

a. *Procedural Due Process*

Holland argues that his procedural due process rights have been violated because home detention and the wearing of an

electronic bracelet are liberty-restricting conditions. (Pl. Br. at 27.)

Pretrial detention implicates a liberty interest entitled to due process protections. United States v. Dekker, 757 F.2d 1390, 1397 (3d Cir. 1985). Procedural due process requires the balancing of three familiar factors:

(1) [T]he private interest that will be affected by the official action;

(2) [T]he risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and

(3) [T]he government's interest, including the function involved and the fiscal administrative burdens that the additional or substantive procedural requirement would entail.

Mathews v. Eldridge, 424 U.S. 319, 325 (1976).

For any preventive detention decision, the procedural due process inquiry turns on whether a criminal defendant enjoys "procedures by which a judicial officer evaluates the likelihood of future dangerousness [that] are specifically designed to further the accuracy of that determination." Salerno, 481 U.S. at 751. Under the CJRA, a criminal defendant must therefore have some opportunity to contest potentially-inaccurate or substantively-unfair PSA or DMF procedures.

The CJRA specifically states that when, as here, the prosecutor seeks pretrial detention, the defendant is entitled

to a pretrial detention hearing. N.J.S.A. 2A:162-18. At this
hearing, the defendant has the right:

> to be represented by counsel, and, if financially unable to
> obtain adequate representation, to have counsel appointed.
> The eligible defendant shall be afforded an opportunity to
> testify, to present witnesses, to cross-examine witnesses
> who appear at the hearing, and to present information by
> proffer or otherwise.

N.J.S.A. 2A:162-19(e)(1). Further, if the court orders a
defendant to be held in custody pending trial, the defendant may
appeal that decision and have it heard on an expedited basis.
N.J.S.A. 2A:162-18(c). A criminal defendant may also file a
motion to reconsider his conditions of release at any time,
based on "a material change in circumstances." N.J.S.A. 3:26-
2(c)(2).

Here, Holland actually had a pretrial detention hearing on
April 11, 2017 before the Hon. Kathleen Delaney, J.S.C., with
the opportunity to afford himself of all the protections
outlined in N.J.S.A. 2A:162-19(e)(1). (Feldman Decl. ¶ 14.)
Instead of going forward with the pretrial detention hearing,
however, Holland's counsel informed Judge Delaney that the
parties had agreed to Level 3+ monitoring. (Id. at ¶ 12.) And
Holland consented, on the record, to these conditions. (Id. at ¶
17.) Moreover, Holland can still file a motion in state court
under N.J.S.A. 3:26-2(c)(2), arguing that changed circumstances
warrant less-restrictive conditions of his pretrial release.

Indeed, "changed circumstances" may well include the passage of time itself, rendering his allegedly violent behavior less recent, coupled with good behavior while under pretrial supervision, if such be the case.

On this record, the Court finds it is likely that Holland voluntarily and knowingly waived his right to a pretrial detention hearing when he agreed to be released subject to the previously-described, non-monetary conditions in exchange for his release from jail. One who waives the judicial process may not claim due process is denied. See Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000)("In order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her."). Further, even if one assumes for the sake of argument that Holland and his counsel did not waive the detention hearing rights, the process of appellate review in the Superior Court's Appellate Division would be open to him, of which he has also not availed himself. Thus, the Court finds that Plaintiffs are unlikely to succeed on the merits of their procedural due process claim.

b.    *Substantive Due Process*

Plaintiffs also raise a substantive due process challenge to the CJRA. "The substantive component of the Due Process Clause limits what government may do regardless of the fairness of procedures that it employs," Boyanowski v. Capital Area

<u>Intermediate Unit</u>, 215 F.3d 396, 399 (3d Cir. 2000), in order to "guarantee protect[ion] against government power arbitrarily and oppressively exercised," <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998) (citing <u>Daniels v. Williams</u>, 474 U.S. 327, 331, (1986)). Substantive due process "prevents the government from engaging in conduct that 'shocks the conscience' . . . or interferes with rights 'implicit in the concept of ordered liberty.'" <u>Salerno</u>, 481 U.S. at 746. "[T]here is a substantive liberty interest in freedom from confinement." <u>United States v. Perry</u>, 788 F.2d 100, 112 (3d Cir. 1986). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." <u>Salerno</u>, 481 U.S. at 755.

At the outset, the Court declines the State Defendants' invitation to deny Plaintiffs' substantive due process claim where a particular amendment provides an explicit textual source of constitutional protection. (Def. Opp. Br. at 38.) At this preliminary stage, the Court has not identified protections under the Eighth Amendment, <u>see</u> Section IV.B.1, <u>supra</u>, or the Fourth Amendment, <u>see</u> Section IV.B.3, <u>infra</u>, that protect the interest Plaintiffs seek to identify. The Court thus proceeds to the merits of Plaintiffs' claim of denial of substantive due process.

Holland argues that his substantive due process rights have been violated because the CJRA prevents him from having the

option of posting monetary bail sufficient to ensure his future appearance before being subjected to severe deprivations of pretrial liberty. (Pl. Br. at 28.) As a result, Plaintiffs argue, the CJRA "replaces the liberty-preserving option of bail with liberty-restricting conditions of release." (Id. at 32.) The State Defendants respond that having the option of monetary bail is not a "fundamental" right and need not be considered before non-monetary conditions of pretrial release are implemented. (Def. Opp. Br. at 41.)

Plaintiffs claim that the right to have "bail" (i.e., money bail) be considered as an option is "fundamental to [our] scheme of ordered liberty." (Pl. Rep. Br. at 29) (quoting McDonald v. City of Chicago, Ill., 561 U.S. 742, 767 2010).) To that end, Plaintiffs repeat the uncontroversial position that "bail is the mechanism employed for centuries by our legal system to preserve the 'axiomatic and elementary' presumption that a person accused but unconvicted of a crime is innocent until proven guilty." (Pl. Br. at 29-30) (quoting Coffin, 156 U.S. at 453).

The Court finds Plaintiffs' argument that the option to money bail is a "fundamental" right to be unpersuasive. First, McDonald is a Second Amendment case which does not directly address the issue of bail, except to the extent that the Court recognized the Eighth Amendment's protection against excessive bail had previously been incorporated vis-à-vis the states in

Schilb v. Kuebel, 404 U.S. 357 (1971). McDonald, 561 U.S. at 764 n.12. Second, as discussed in Section IV.B.1, supra, Plaintiffs' argument fails to distinguish between money bail and non-monetary conditions of bail, especially in light of Salerno. Again, Plaintiffs have not cited a single post-Salerno bail cases, let alone one describing monetary bail as a "fundamental" right. Accordingly, the Court will again look to Salerno for guidance.

In Salerno, the Court discussed due process considerations within the context of setting a criminal defendant's bail conditions. The Salerno Court upheld the constitutionality of the statute's provision permitting "pretrial detention on the ground that the arrestee is likely to commit future crimes." 481 U.S. at 744, 750. The Court noted that the Act "operates only on individuals who have been arrested for . . . extremely serious offenses." Id. at 749. The provision withstood constitutional scrutiny precisely because it included procedural protections — including an individualized finding of risk to the public from failure to impose a specific requirement.

Holland argues that the CJRA system unfairly predicts his future dangerousness, essentially eliminating the possibility of money bail for his release. That the CJRA process resulted in Holland's release from pretrial detention on conditions of home confinement (with permission to maintain full-time employment),

electronic monitoring (financed by the state due to Holland's indigency), and occasional reporting to a pretrial services officer does not shock the Court's conscience, nor does the absence of a monetary bail option in lieu of, or in addition to, restrictions that are aimed at deterring dangerousness. Moreover, Holland failed to challenge his PSA scores or DMF recommendation when he had the opportunity to do so. Either way, Plaintiffs present no grounds for finding that a criminal defendant's option to obtain monetary bail is a fundamental right or implicit in the concept of ordered liberty. The Court therefore finds that Plaintiffs are unlikely to succeed on the merits of their substantive due process claim.

### 3.   Fourth Amendment

Finally, Plaintiffs ask the Court to declare that the CJRA violates the Fourth Amendment rights of Holland and other presumptively innocent criminal defendants to be free from unreasonable searches and seizures. Specifically, Holland argues that the electronic location monitoring is a "severe" intrusion of his privacy and constitutes an unreasonable search under the Fourth Amendment, while home detention constitutes an unreasonable seizure. (Pl. Rep. Br. at 34.) To that end, Plaintiffs argue that electronic monitoring and home detention are not "needed" to promote the government's interest in securing Holland's appearance for trial when they could have

easily offered money bail. (Id. at 35.) The State Defendants
reply that the balance of reasonableness "undoubtedly favors the
legitimate governmental needs of the State of New Jersey"
because, here, Holland was charged with a serious crime, second-
degree aggravated assault, and he knowingly agreed to electronic
monitoring and home detention as a condition to his pretrial
release. (Def. Opp. Br. at 43-44.)

The Fourth Amendment mandates that

> [t]he right of the people to be secure in their persons,
> houses, papers and effects, against unreasonable searches
> and seizures, shall not be violated, and no Warrants shall
> issue, but upon probable cause, supported by Oath or
> affirmation, and particularly describing the place to be
> searched, and the persons or things to be seized.

U.S. Const. amend. IV. Accordingly, the Fourth Amendment only
prohibits "unreasonable" searches and seizures. United States v.
Katzin, 769 F.3d 163, 169 (3d Cir. 2014). "Reasonableness" is
analyzed by a "totality of the circumstances" test, "assessing
on the one hand, the degree to which [the search or seizure]
intrudes upon an individual's privacy and, on the other, the
degree to which it is needed for the promotion of legitimate
governmental interests." Samson v. California, 547 U.S. 843, 848
(2006) (citations and internal quotation marks omitted).

The Court agrees that, under normal circumstances, 24-hour
electronic monitoring would likely constitute an intrusion upon
an individual's reasonable expectation to privacy. However, as

the Supreme Court has explained, "[o]nce an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, his or her expectations of privacy . . . are reduced." Maryland v. King, 133 S. Ct. 1958, 1978 (2013). Moreover, the state's interest in ensuring a potentially-dangerous defendant's appearance at trial is strong. Salerno, 481 U.S. at 749 ("The government's interest in preventing crime by arrestees is both legitimate and compelling."). Thus, in the pretrial-release context, electronic monitoring and home arrest may be well "reasonable."

The Fourth Amendment generally interposes the determination of a judicial officer in determining the reasonableness of significant intrusions into the liberty or property of an individual. Thus, absent exigent circumstances or other limited exceptions, a judicial officer must determine whether probable cause exists to search a home under a search warrant or to arrest a suspect under an arrest warrant. Likewise, cases too numerous to fully list have held that the judicial officer's determination of reasonableness under all the circumstances is deemed to protect the right to be free of unreasonable searches and seizures that the Fourth Amendment protects. See, e.g., Michigan v. Summers, 452 U.S. 692, 704-05 (1981); Johnson v. United States, 333 U.S. 10, 15 (1948).

Likewise, where conditions of pretrial release in a criminal case restrict freedom of movement and can be regarded to that extent as a seizure of the individual, the safeguard of a judicial determination upon the record protects against unreasonable seizures by examining the totality of the relevant circumstances. The careful process of gathering reliable information and risk assessments, such as New Jersey's Public Safety Assessment, appears to provide a valuable tool for the judge in determining the issue of detention and release, including the stringency of conditions of release. The use of such a tool further supports the likelihood of a reasonable level of detention or release upon a spectrum of intrusion on freedom while awaiting trial.

Again, the Court cannot overlook the fact that Holland waived the opportunity to have a pretrial detention hearing with counsel, witnesses, and cross-examination. Instead, he agreed to the electronic monitoring and home detention conditions. Holland might have avoided these "severe" restrictions of his liberty had he proceeded with his pretrial detention hearing and argued for the removal of the NVCA flag he was assigned. He also could have argued for other non-monetary conditions, as enumerated in the CJRA, which are less severe than home detention or electronic monitoring. See N.J.S.A. 2A:162-17. But, faced with the risk of pretrial detention, Holland chose instead to be

released under partial home confinement and electronic location monitoring. Within this context, the Court does not find the pretrial conditions imposed on Holland to be unreasonable. Cf. Belleau v. Wall, 811 F.3d 929, 932 (7th Cir. 2016) (Posner, J.) ("Having to wear a GPS anklet monitor is less restrictive, and less invasive of privacy, than being in jail or prison.")[24] As a result, the Court finds that Holland's Fourth Amendment claim is unlikely to succeed on the merits.

### 4. Summary of Likelihood of Success Prong

In summary, neither Holland nor Lexington has shown likelihood of success on the merits of their Eighth Amendment, Fourteenth Amendment, and Fourth Amendment claims. Neither plaintiff has made a showing of a reasonable probability of eventual success on any claim examined above. The Court now turns to examine the remaining factors for preliminary injunctive relief.

### C. Probability of Irreparable Harm

Plaintiffs have the burden of demonstrating "potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm." Instant Air Freight,

---

[24] As State Defendants correctly argue, if Holland had not consented to non-monetary conditions, the judge could have ordered pretrial detention given the violent nature of the crime charged. (Def. Opp. Br. at 44.)

882 F.2d at 801. This requires demonstration of "actual or imminent harm which cannot otherwise be compensated by money damages." Frank's GMC, 847 F.2d at 103.

Plaintiffs argue that the irreparable harm to Holland and Lexington lies in the continuing constitutional infringement resulting in restrictions of liberty of Holland (and of Lexington's clients). (Pl. Br. at 35-36.) Plaintiffs claim that Holland is harmed by being "subjected to severe restrictions of liberty without being offered the constitutionally required alternative of monetary bail." (Id. at 36.) Lexington, on the other hand, appears to make no argument for its own irreparable injury. (See id. at 35-37, Pl. Reply Br. at 19-20.) To the extent Lexington suggests it is suffering economic harm from loss of opportunities to underwrite bail bonds, such harm may be tangible and ongoing but there is no showing that it is probably caused by a violation of Lexington's rights, since there is no right to engage in bail bonding implied or expressed in the Constitution, as discussed above.

The Court acknowledges that where probable success on the merits of a constitutional claim is shown, and such violation will continue unless enjoined, the continuing constitutional violation can constitute irreparable harm. See, e.g., Stilp v. Contino, 613 F.3d 405, 409 (3d Cir. 2010) (noting that First Amendment violation satisfies irreparable injury requirement);

<u>Forchion v. Intensive Supervised Parole</u>, 240 F. Supp. 2d 302, 310 (D.N.J. 2003) (addressing continued incarceration). In the present case, lacking a showing of likely success on the merits of the claimed constitutional violations, the Court finds scant likelihood of irreparable harm if an injunction is denied.

Holland's harm is also not irreparable because he has a possible remedy available to him ameliorating the so-called "severe" conditions of partial home confinement with electronic monitoring; namely, as discussed above, he can seek a modification of his restrictions, and appeal any denial to the Appellate Division and New Jersey Supreme Court. A federal court injunction is not a necessary remedy where the prospect of a state remedy is available.

For these reasons, the Court finds Plaintiffs have failed to demonstrate likelihood of irreparable harm if Defendants are not enjoined.

### D.    Balance of Harms

Granting the preliminary injunction would pose a high risk of harm to other interested persons. <u>See</u> <u>Reilly</u>, 858 F.3d at 176. An injunction mandating consideration of monetary bail may reinstall the system of financial requirements that, prior to the CJRA and the new procedures for pretrial release, resulted in the jail detention of persons unable to meet even modest financial conditions, as discussed above. Rolling back the

measurable gains brought about under the CJRA since January 2017 by reinstating the primacy of money bail may also harm the general community by displacing pretrial restrictions meant to protect the community and individual victims and witnesses from risk of harm. These concerns of protecting against risk of danger to the community are not generally mitigated with the posting of money bail.

Against such possible harms to other defendants in the criminal justice system who are unable to afford money bail and the risk of harms to the community and specific persons, the harm to Holland if the preliminary injunctive relief is denied is minimal. During this interval before his trial, he will be under the pretrial regime of electronic location monitoring and partial home confinement with exceptions for employment. Moreover, the opportunity he seeks to rid himself of these restrictions through injunctive relief would itself come at a cost of posting cash or paying a bail bond premium, the latter which he would not get back even if he faithfully performs his pretrial obligations. Although the amount of monetary bail that might be set is unknown, he currently is not being charged a bail bond premium (customarily 10% of the monetary bail amount). That cost of monetary bail to Holland and other persons accused of crimes and awaiting trial would thus be a negative

consequence to Holland and others if this injunction were

granted.[25]

Thus, the balance of harms tips decidedly against granting

the preliminary injunction.

### E.    Considerations of the Public Interest

The three branches of New Jersey's government — the

Executive, Legislative, and Judicial — enabled by a strong

public vote in the 2014 referendum have put considerable effort

into reforming a monetary-based bail system that resulted in

excessive detentions for mere financial inability and failed to

assess risks of danger. They have collaborated, as described in

Section II.A, supra, to put into place a framework for

determining conditions of pretrial release that considers not

only risk of flight but also risk of harm to the community and

to specific persons, as well as risk of obstruction of justice.

There is an undeniably strong public interest in maintaining

such a reform, provided that it is constitutional. On the other

hand, the shortcomings of a system that elevated monetary bail

as the principal (or only) condition of pretrial release were

well-documented in the VanNostrand Report and Report of the

Joint Committee on Criminal Justice, discussed in Section II.A,

---

[25] It follows that the non-refundable cost of a bail bond to
Holland would be a financial gain to a bonding surety like
Lexington, placing the two plaintiffs in some degree of
conflict.

supra. This accomplishment, moving from "a largely 'resource-based' system of pretrial release to a 'risk-based' system of pretrial release," Report of the Joint Committee on Criminal Justice at 8, should not be set aside absent a clear demonstration of its unconstitutionality.

The strength of the public interest, expressed in the state's reform efforts pursued between 2012 and 2017, is another weighty consideration why the preliminary injunctive relief should be denied.

### F. Summary of Preliminary Injunction Factors

This Court, in accordance with Reilly, Issa, and other recent Third Circuit precedent discussed in Part III above, must determine whether the movants have shown a reasonable probability of eventual success in the litigation and that they will likely be irreparably injured; those two prerequisites are required showings, in addition to which the court should take into account, when relevant, the possibility of harm to other interested persons from the grant or denial of the injunction, and the public interest served by grant or denial of the injunction.

In the present matter, Plaintiffs have not made a substantial showing of possibility of success nor of irreparable harm stemming from unconstitutional conduct under the CJRA, either on the face of the statute or as applied. Additionally,

the balance of risk of harm to others if the injunction is granted substantially outweighs the harms to Plaintiffs if the injunction is denied. Moreover, the public interest in the success of the risk-based release system exceeds the private interests of Holland and Lexington National if the present situation continues as the litigation unfolds.

Finally, if these considerations were a close call — which the Court does not find them to be — then the balance would even further tip in favor of denying the injunction because of doubts about Lexington's standing and the arguments favoring <u>Younger</u> abstention, to be considered further by the Court in upcoming dispositive motion practice.

For all these reasons, Plaintiffs' motion for preliminary injunctive relief will be denied. The accompanying Order will be entered.


**September 21, 2017**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     U.S. District Judge